## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| MICHAEL BERRY, Individually and on Behalf of All Other Persons Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>KIOR, INC., FRED CANNON, and JOHN K. KARNES,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.: 4:13-cv-2443<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Michael Berry ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Kior, Inc. ("Kior" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased Kior securities between August 14, 2012 and

August 7, 2013, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against the Company and certain of its top officials.

2.      Kior is a renewable biofuels manufacturer that has developed a proprietary technology platform to convert cellulose and other plant-derived materials into renewable crude oil that is processed into gasoline, diesel and other fuels. In 2012, the Company completed its first commercial scale biofuel facility in Columbus, Mississippi.

3.      During the Class Period the Company touted to investors the planned capabilities of its Columbus facility, stating:

> The [Columbus] facility was designed to produce up to *13 million gallons of cellulosic diesel and gasoline per year*. During the fourth quarter of 2012, the Company successfully commissioned its proprietary biomass fluid catalytic cracking, or BFCC, operation at the Columbus facility, and produced its first "on spec" cellulosic intermediate oil in limited quantities.
>
> [Emphasis added.]

4.      The Company also reported to investors another planned large scale biofuel production facility in Natchez, Mississippi, with larger production capabilities than the Columbus facility:

> We currently intend to construct our planned first standard commercial production facility in Natchez, Mississippi beginning in the second half of 2013, subject to our ability to raise additional capital. *This facility is being designed to produce up to 40 million gallons of cellulosic diesel and gasoline per year, approximately three times the amount of our Columbus facility*, in order to take advantage of economies of scale.
>
> [Emphasis added.]

5.      Throughout the Class Period the defendants misled investors concerning the timing of projected production levels of biofuel at the Columbus facility. Specifically, despite

2

constant setbacks and missed milestones, the defendants continued to falsely reassure investors that the Company remained on track to achieve commercially meaningful biofuel production levels at the Columbus facility during the timeframes promised.

6.      In one particularly egregious example, during the Company's fourth quarter 2012 earnings call on March 18, 2013, after the Company's first commercial shipment of biofuel from the Columbus facility occurred over four months later than Defendant Cannon, the Company's CEO, had previously promised on prior earnings calls in 2012, Defendant Cannon continued to mislead investors with false reassurances:

> I do recognize however that many of you were expecting us to commence commercial shipments late last year, consistent with our guidance from our last conference call. Did we set an aggressive target for ourselves? Yes. Am I disappointed that we missed our target? Absolutely yes. Did we encounter unexpected startup issues unrelated to our technology? Yes we did. *However, we have overcome these normal startup issues and we have proven that KiOR's proprietary biomass to fuels technology works at commercial scale at Columbus.*

7.      Yet, despite this and other promises that the Company had fixed the issues holding back production and was back on track to shortly produce commercially meaningful quantities of biofuel, the Company failed to achieve meaningful production levels during the first quarter of 2013. Nevertheless, Defendant Cannon stated the following during the Company's first quarter 2013 conference call on May 9, 2013: "**Consistent with our previous guidance, we expect that total fuel production during the second quarter will range between 300,000 and 500,000 gallons, keeping us on track to fall within our projected production range of 3 million to 5 million gallons for 2013**." (Emphasis added.*)*

8.      On August 8, 2013, the Company disclosed to investors that it had only shipped 75,000 gallons of biofuel during the second quarter of 2013 – far below the 300,000-500,000

gallons Defendant Cannon had promised investors less than three months before.  Specifically, the Company stated in a press release the following:

> "In total," Cannon continued, "we shipped over 75,000 gallons of cellulosic fuel from Columbus. The BFCC unit is running now and producing high quality oil that we are preparing to upgrade into fuel and ship to our customers. Over the next few months, we will focus on further building that progress and we look to push the facility closer to its nameplate capacity."

9.      On this news, Kior investors fled from the stock, causing its share price to decline $2.12 per share or over 44%, over the course of the next six trading sessions, from a close of $4.76 per share on August 7, 2013 to a close of $2.62 per share on August 15, 2013.

10.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was not on track to produce commercially meaningful quantities of biofuel at the Columbus facility in the amounts projected by management during the timeframes promised; (2) the Company lacked adequate internal and financial controls over its calculation and forecasting of production levels at the Columbus facility; and (3) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

11.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

14.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) as the Company's headquarters are located in this District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, purchased Kior securities at artificially inflated prices during the Class Period, and was damaged upon the announcement of the alleged corrective disclosure.

17.     Defendant Kior, is a Delaware corporation with its headquarters located at 13001 Bay Park Road, Pasadena, Texas, 77507. Its common stock is traded on NASDAQ under the ticker symbol "KIOR."

18.     Defendant Fred Cannon ("Cannon") has served at all relevant times as the Company's President and Chief Executive Officer.

19.     Defendant John H. Karnes ("Karnes") has served at all relevant times as the Company's Chief Financial Officer.

20.     The defendants referenced above in ¶¶ 18 - 19 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Kior has developed a proprietary catalytic process that allows it to produce cellulosic gasoline and diesel from abundant, lignocellulosic biomass. The Company's cellulosic gasoline and diesel are hydrocarbon fuels similar to their traditional petroleum-based counterparts. In 2012, the Company completed construction of its first, initial-scale commercial biofuel production facility in Columbus, Mississippi.

### Materially False and Misleading
### Statements Issued During the Class Period

22.     On August 14, 2012, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2012.  For the quarter, the Company recognized no revenues and reported a net loss of $23 million or $0.22 per share. Regarding its operations, and future production of biofuel, the Company stated in relevant park in the press release:

> "We are proceeding on schedule with the commissioning of our Columbus facility and are on track to start the facility up next month," said Fred Cannon, KiOR's President and Chief Executive Officer. "With startup in September, we anticipate that the Columbus facility will be providing America's first truly sustainable cellulosic gasoline and diesel for American vehicles in the fourth quarter. Also, we expect that the final construction costs for the Columbus facility will be about four percent under our latest cost estimate."

> "In addition to the progress at the Columbus facility, our research and development efforts have generated major advances to our proprietary biomass-to-fuels technology. Once implemented, we believe that these improvements should allow us to increase our nameplate capacity up to 20 percent and significantly decrease the capital intensity of our facilities," Cannon concluded.

***

KiOR did not recognize revenue during the second quarter of 2012; its activities remained focused on construction of its first commercial facility in Columbus, research and development designed to improve production yields, and obtaining necessary financing for its expansion plan.

23.     That same day, the Company filed a quarterly report for the period ended June 30, 2012 on a Form 10-Q with the SEC signed by Defendants Cannon and Karnes and reiterated the Company's previously reported financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Cannon and Karnes stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting. The quarterly report reiterated the Company's purported abilities to produce commercially viable quantities of biofuel, stating, "[t]he [Columbus] facility was designed to produce up to *13 million gallons of cellulosic diesel and gasoline per year*." (Emphasis added).

24.     The Company held an earnings call on August 14, 2012 to update investors regarding Kior's progress towards producing commercially viable quantities of its biofuel. On this earnings call Defendant Cannon stated in relevant part:

> [C]ommissioning of our Columbus facility remains on track and we are getting ready to startup the facility in September. Given the typical startup issues that we expect to face, we remain confident that our cellulosic gasoline and diesel *will be an American cars and trucks during the fourth quarter of this year*.

> [Emphasis added.]

25.     On November 8, 2012, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2012.  For the quarter, the Company reported no revenues, and a net loss of $27 million or $0.26 per share. The Company continued to tout the commercial viability of its biofuel, reporting to investors in its press release that:

> "I am pleased to announce that we have commenced operations at the Columbus facility and have produced a high quality oil that is in line with our specifications

for upgrading into cellulosic gasoline and diesel," said Fred Cannon, KiOR's President and Chief Executive Officer. "More importantly, we believe the high quality of the oil from the Columbus facility validates KiOR's proprietary biomass fluid catalytic cracking, or BFCC, technology at commercial scale. The facility's performance to date not only meets our expectations based on our experience at our pilot and demonstration scale facilities, but also gives me confidence that we remain on track to upgrade our oil in order to ship America's first truly sustainable cellulosic gasoline and diesel for American vehicles."

"Furthermore, our research and development efforts continue to make progress increasing our yields and reducing our capital intensity. Our work continues on our next generation catalyst platform, which we believe can produce a yield of 72 gallons per bone dry ton of biomass when implemented at our full scale commercial facility in Natchez. Moreover, we believe that this catalyst platform will reduce the amount of coke made in our process by up to 25 percent, which would enhance the capital efficiency of our commercial facilities by giving us the ability to process up to 25 percent more feedstock without significant additional capital," Cannon concluded.

26.    On November 13, 2012, the Company held an earnings call to update investors regarding Kior's progress towards producing commercially viable quantities of its biofuel. On this earnings call Defendant Cannon continued to tout to investors the Company's progress towards producing bio-fuel in commercially viable quantities, stating in relevant part:

Good morning and thank you for joining us on our conference call. Today, I want to update you on our successful start-up of our Columbus facility and discuss our progress on the R&D front. Starting first with Columbus. *Recall on our last earnings call in August, I said, we plan to commence start-up operations at the facility in September and to make our first commercial shipments during the October, November timeframe. In this regard, I'm pleased to report, that we started production at the Columbus facility in October*. Our proprietary technology is operating as designed at commercial scale and producing a high quality renewable crude oil, conforming to our design specs. We have also been building our old inventory and anticipating, commencing, upgrading operations in the next week or so.

*All of this gives me confidence, that we will share of the world's first cellulosic gasoline and diesel fuel products on schedule later this month*. I will give you a bit more color on the facility start-up and performance, but first, I want to take stock of what we have accomplished getting to this point and what to add then a production at Columbus means for the U.S. generally and the renewable fuel sectors specifically.

[Emphasis added.]

27.     On November 14, 2012, the Company filed a quarterly report for the period ended September 30, 2012 on a Form 10-Q with the SEC signed by Defendants Cannon and Karnes which reiterated the Company's previously reported financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Cannon and Karnes stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

28.     On March 18, 2013, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2012.  In the fourth quarter of 2012, the Company recorded its first revenues since inception, $87,000, and also reported a net loss of $29.7 million and $96.4 million, for the fourth quarter and full year 2012 respectively. In its press release the Company touted its ability to finally generate revenues and produce commercially viable quantities of bio-fuel, stating in relevant part:

> "KiOR hit its most significant milestone to date with the Company's first commercial shipment of cellulosic diesel from its newly commissioned production facility in Columbus, Mississippi," said Fred Cannon, KiOR's President and Chief Executive Officer. "Commencement of commercial shipments from Columbus validates the efficacy of KiOR's biomass-to-hydrocarbon-fuels technology at scale and goes a long way toward dispelling concerns about the renewable fuels industry's ability to make a meaningful contribution to the US's fuel supply needs," Mr. Cannon continued. "This very positive development, along with EPA's recent actions qualifying our cellulosic gasoline for the RFS2 market and increasing our gasoline blend rate to 25%, de-risk our business strategy and creates a market for KiOR's hydrocarbon fuels nearly twice the size of the current ethanol market.

29.     On March 18, 2013, the Company also filed an annual report for the period ended December 31, 2012 on a Form 10-K with the SEC signed by, among others, Defendants Cannon and Karnes which reiterated the Company's previously reported financial results and financial position. In addition, the Form 10-K contained signed certifications pursuant to SOX by

Defendants Cannon and Karnes stating that the financial information contained in the Form 10-K was accurate, and disclosed any material changes to the Company's internal control over financial reporting. The Company informed investors that it was expanding its production capabilities, by building a new facility in Natchez, Mississippi:

> We currently intend to construct our planned first standard commercial production facility in Natchez, Mississippi beginning in the second half of 2013, subject to our ability to raise additional capital. *This facility is being designed to produce up to 40 million gallons of cellulosic diesel and gasoline per year, approximately three times the amount of our Columbus facility, in order to take advantage of economies of scale.* Our design plan for these standard commercial production facilities, subject to our ability to raise sufficient capital, to utilize a centralized hydrotreating facility rather than dedicated, standalone hydrotreaters such as the one constructed at our Columbus facility. By employing larger plant designs and shared hydrotreating facilities, we expect to be able to more effectively allocate our fixed costs and stage our capital program to reduce the capital intensity of our commercial expansion. We estimate that the construction costs for each of our standard commercial production facilities will average approximately $350 million, depending on each facility's specific design requirements. Our two-train centralized hydrotreaters will be constructed in phases, with each train expected to support up to two standard commercial production facilities. We estimate that construction costs for our hydrotreaters will average approximately $110 million per train. By staging the expansion of our standard commercial facilities in discrete facility-by-facility projects that are independently viable, we believe that we will have flexibility to plan our growth in response to capital availability and market conditions.

> [Emphasis added.]

30.     During an earnings call also held on March 18, 2013, the Company misleadingly informed investors regarding the commercial viability of its production of biofuel. Defendant Cannon stated in relevant part:

> As our last update in November, we have made substantial progress in addressing all three of these risks. *Yesterday our Columbus facility made the world's first commercial shipment of cellulosic diesel fuel, the most important step in answering the remaining questions surrounding our scale up risk.* With this shipment, we have now operated our proprietary biomass to fuel platform from beginning to end at commercial scale, with the final hydrocarbon products, gasoline and diesel produced by our facility on specification and ready to drop into American cars and trucks.

A mitigation of scale up risk due to commercial production of cellulosic gasoline and diesel at Columbus is a remarkable achievement by the KiOR team. In four years we have successfully achieved a 20,000 ton scale up in our proprietary biomass to fuels technology from proof of concept in our pilot plant to our demonstration plant and now to our first commercial scale facility at Columbus. In less than two years after breaking ground in Columbus, we have constructed, commissioned and operated our technology on a commercial scale. Quality of the world's first commercially produced cellulosic gasoline and diesel has exceeded our expectations and I couldn't be more proud of the KiOR team for this accomplishment,

*I do recognize however that many of you were expecting us to commence commercial shipments late last year, consistent with our guidance from our last conference call. Did we set an aggressive target for ourselves? Yes. Am I disappointed that we missed our target? Absolutely yes. Did we encounter unexpected startup issues unrelated to our technology? Yes we did. However, we have overcome these normal startup issues and we have proven that KiOR's proprietary biomass to fuels technology works at commercial scale at Columbus.*

In fact, we know now that our technology performs better in terms of quality as it is scaled. From very good oil at the very small pilot plant to even improved quality oil at the demo and now to our best ever quality oil made at Columbus. So high in quality we're converting over 90% of our oil from Columbus into transportation fuel. This compares to conventional crude oil which is globally only 70-70% conversion.

Now, our focus at Columbus turns towards achieving steady state operations. Until we have the facility fully lined down, which we believe could take at least nine months, any guidance that we might give to the basic metrics of plant performance that we use in petrochemicals or have to have an unusually wide error bar around that. Given what I just said about the fact that production volumes in the first quarter will be negligible, looking at the remaining nine months of the year, **we believe our volume expectations to be approximately 3 to 5 million gallons for the balance of the year.** We have learned a lot at Columbus over the last several months and we believe we can apply the learnings from Columbus to the engineering and design of Natchez.

[Emphasis added.]

31.    On May 9, 2013, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2013.  For the quarter, the Company reported total revenues of $71,000, and a net loss of $31.3 million or $0.30 per share. The Company also

provided the following guidance to investors regarding commercially viable shipments to customers:

> "Building on the first gallons of cellulosic diesel we shipped in March, we continue to make progress with operations at our Columbus facility," said Fred Cannon, KiOR's President and Chief Executive Officer. "The on-stream percentage of our core technology in the first quarter improved approximately 500 percent over the fourth quarter. Most of our individual run times are longer than the previous runs, and we are working toward taking the facility into a steady state of operations."

> "Most significantly," Cannon continued, "our core technology is continuing to operate as designed, and the facility is producing high quality oil and cellulosic fuel. With these positive trends, we expect that our fuel shipments will increase and become more frequent."

32.     During an earnings call held that same day, the Company continued to mislead investors regarding the commercial viability of its production of biofuel, specifically providing guidance of "300,000 to 500,000" gallons of total fuel production for the second quarter. Defendant Cannon stated in relevant part:

> First, let me take this opportunity to tell you what's going on at Columbus. As you know, we produced and shipped the world's first commercial volume of cellulosic diesel during the first quarter. Our core technology continues to perform at or above our expectations. *We are pleased with the progress of the start-up of the facility and it is consistent with both our experience and our guidance from last quarter. Most importantly, the facility is running.* As we expected, we are beginning to see everything coming together. The operational data from last quarter bears this out.
>
> * * *
>
> *Looking now to our expectations for production in the second quarter. We are poised to build on positive momentum in the first quarter.* We have already had a production run at the converter in April that nearly matched our average performance during the first quarter. We expect our on-stream percentage and our average production run to increase on a quarter-over-quarter basis from the first quarter. We expect that our upgrading unit which performed exceedingly well in making own specification gasoline and diesel during the first quarter, will upgrade the oil that we are producing today into high-quality cellulosic diesel and gasoline for shipment during the quarter.
>
> *Consistent with our previous guidance, we expect that total fuel production during the second quarter will range between 300,000 and 500,000 gallons,*

*keeping us on track to fall within our projected production range of 3 million to 5 million gallons for 2013*. With the gasoline pathway now approved by EPA and effective, we can produce, ship and sell both our cellulosic gasoline and diesel with a clear path to market under RFS2. Now having proven our technology, produced high-quality oil and upgraded to consistently high-quality diesel and gasoline, we are on our way to filling up more vehicles in America with cellulosic fuel made from nonfood sources and offering a significantly less environmental footprint when compared to conventional fuels. And this from a company which just came into existence in late 2007.

33.     On May 10, 2013, the Company filed a quarterly report for the period ended March 31, 2013 on a Form 10-Q with the SEC signed by Defendants Cannon and Karnes which reiterated the Company's previously reported financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Cannon and Karnes stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

34.     The statements referenced in ¶¶ 22 - 33 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (1) the Company was not on track to produce commercially meaningful quantities of biofuel at the Columbus facility in the amounts projected by management; (2) the Company lacked adequate internal and financial controls over its calculation and forecasting of production levels at the Columbus facility; and (3) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## THE TRUTH EMERGES

35.     On August 8, 2013, the Company disclosed to investors that it had only shipped 75,000 gallons of biofuel during the second quarter of 2013 – far below the 300,000-500,000

13

gallons Defendant Cannon had promised investors a mere three months before. The Company

stated in a press release the following:

> "In total," Cannon continued, "we shipped over 75,000 gallons of cellulosic fuel
> from Columbus. The BFCC unit is running now and producing high quality oil
> that we are preparing to upgrade into fuel and ship to our customers. Over the
> next few months, we will focus on further building that progress and we look to
> push the facility closer to its nameplate capacity."

36.     On this news, Kior investors fled from the stock, and Kior stock declined $2.12

per share or over 44%, over the course of the next six trading sessions, from a close of $4.76 per

share on August 7, 2013 to a close of $2.62 per share on August 15, 2013.

37.     As a result of Defendants' wrongful acts and omissions, and the precipitous

decline in the market value of the Company's securities, Plaintiff and other Class members have

suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Kior securities during the Class Period (the "Class"),  and were damaged by

the alleged corrective disclosures.  Excluded from the Class are defendants herein, the officers

and directors of the Company, at all relevant times, members of their immediate families and

their legal representatives, heirs, successors or assigns and any entity in which defendants have

or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, Kior securities were actively traded on NASDAQ.

While the exact number of Class members is unknown to Plaintiff at this time and can be

ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Kior or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

41.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Kior;

- whether the Individual Defendants caused Kior to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Kior securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

15

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

44.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Kior securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Kior securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

45.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

48.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Kior securities; and (iii) cause Plaintiff and other members of the Class to purchase Kior securities  at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

49.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Kior securities.  Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Kior's finances and business prospects.

50.     By virtue of their positions at Kior, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

51.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Kior, the Individual Defendants had knowledge of the details of Kior's internal affairs.

52.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Kior.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Kior's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Kior securities was artificially inflated throughout the Class Period.  In ignorance of the

adverse facts concerning Kior's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Kior securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

53.     During the Class Period, Kior securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Kior securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of Kior securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Kior securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

54.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

55.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

56.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

57.     During the Class Period, the Individual Defendants participated in the operation and management of Kior, and conducted and participated, directly and indirectly, in the conduct of Kior's business affairs.  Because of their senior positions, they knew the adverse non-public information about Kior's ability to produce its biofuels in commercially viable quantities.

58.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Kior's financial condition and results of operations, and to correct promptly any public statements issued by Kior which had become materially false or misleading.

59.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Kior disseminated in the marketplace during the Class Period concerning Kior's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Kior to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Kior within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Kior securities.

60.     Each of the Individual Defendants, therefore, acted as a controlling person of Kior.  By reason of their senior management positions and/or being directors of Kior, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

20

Kior to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Kior and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

61.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Kior.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 20, 2013

**ABRAHAM, WATKINS, NICHOLS, SORRELS, AGOSTO & FRIEND**

**/s/ Sammy Ford IV**

Sammy Ford IV
800 Commerce Street
Houston, Texas 77002
Telephone: (713) 222-7211
Telecopier: (713) 225-0827
sford@abrahamwatkins.com

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP**
Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

**WOHL & FRUCHTER LLP**
J. Elazar Fruchter
570 Lexington Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 758-4000
Fax: (212) 758-4004
jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*