UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MICHAEL BERRY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>vs.<br><br>KIOR, INC., FRED CANNON, and JOHN K. KARNES,<br><br>Defendants. | No.: 4:13-cv-2443<br><br>**PLAINTIFFS' [PROPOSED] SUPPLEMENTAL PLEADING PURSUANT TO FED. R. CIV. P. 15(D)** |

Lead Plaintiffs Dave Carlton and Sharon Kegerreis (collectively the "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Supplemental Pleading Pursuant to Federal Rule of Civil Procedure 15(d) (the "Supplemental Pleading") allegations relating to: (i) the resignation of director, co-founder, and former Chief Technology Officer Paul O'Connor ("O'Connor"); and (ii) the United States Securities and Exchange Commission's ("SEC") ongoing investigation of KiOR Inc. ("KiOR" or the "Company").

The following allegations are made upon facts obtained from review and analysis of relevant filings made by KiOR with the SEC. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth in Plaintiffs' Second Amended Complaint and Supplemental Pleading after a reasonable opportunity for discovery.

**PAUL O'CONNOR'S RESIGNATION**

1.   Paul O'Connor ("O'Connor") served on KiOR's Board of Directors from

1

November 2007 through June 2012, and again from March 18, 2014 through August 31, 2014. Through his company BIOeCON B.V. and its affiliates, O'Connor co-founded KiOR and supplied it in large part with the technology behind KiOR's biofuel product. O'Connor also served as KiOR's Chief Technology Officer in 2008 and 2009.

2.     On September 5, 2014, KiOR filed a Form 8-K with the SEC indicating that O'Connor resigned from the Company's Board of Directors as of August 31, 2014. The Form 8-K further indicated that O'Connor resigned at the unanimous request of the Board of Directors, which was precipitated by outside counsel's review of O'Connor's conduct. O'Connor's conduct, according to the Form 8-K, included (i) his decision to "with[o]ld a third party technology report, paid for by the Company, from the Board and management"; (ii) "unauthorized communications with persons" during the course of outside counsel's review; and (iii) the "possibility" that O'Connor "failed to comply with the Company's insider trading policy."

3.     KiOR attached O'Connor's resignation letter to the above-mentioned Form 8-K.[1] O'Connor's resignation letter, as described in detail below, confirms the claims, allegations, and theories of liability asserted by Plaintiffs in the Second Amended Complaint.

4.     O'Connor's resignation letter begins by confirming the fact that O'Connor (and his company "BIOeCON") originated "the KiOR technology to convert waste biomass into fuels and chemicals via catalytic pyrolysis (or cracking)." O'Connor then details how he (as Chief Technology Officer at that point) and Defendant Fred Cannon ("Cannon") worked together in

---

[1] O'Connor's resignation letter (and the exhibits attached thereto) is attached hereto as Exhibit "A" and is incorporated herein by reference as if fully set forth below. KiOR redacted certain portions of O'Connor's resignation letter. In the version of the letter filed with the SEC, these portions are indicated by "[**]". Below, these redacted portions are indicated by "[redacted]".

2

2008 and 2009 "in building up the organization, proving the concept in a modified [fluid catalytic cracking] pilot plant and leading the research into improved catalysts." Presciently, O'Connor writes that "[a]lready then we had some technical disagreements about the road forward and managerial issues about the experience and quality of the people being hired." KiOR declined to renew O'Connor as Chief Technology Officer in October 2009, yet allowed him to remain on the Board of Directors for several years thereafter.

5. O'Connor grew concerned about KiOR's operations towards the end of 2011. In response to "additional data" he received, O'Connor was "shocked to see that the yields were lower than reported in February [redacted] and that hardly any progress had been made since the end of 2009." O'Connor writes that he "immediately informed [Defendant Cannon] . . . about [his] concerns regarding the limited improvements achieved." O'Connor was permitted to visit KiOR's operations for a "technology review," but only after "several e-mail and phone discussions with [Defendant Cannon]." Based on his review of KiOR's operations, O'Connor concluded: (i) "that part of the problem of the lower yields, [redacted]"; (ii) yields "ha[d] not improved significantly over the last two years"; and (iii) while it was "possible to reach the target of [redacted] and possibly even also the long term target of [redacted]," doing so would "require a drastically different approach[] than presently being pursued by R&D."

6. KiOR's Board of Directors (including Defendant Cannon) was aware that the Columbus Facility was incapable of meeting Defendants' stated projections. O'Connor describes in his letter a Board of Directors meeting in April or May 2012, at which time KiOR's "R&D director" "admitted that [KiOR] should not expect to reach the [redacted] at Columbus, but possibly at the next commercial plant including further reactor modifications." O'Connor

3

recalls "estimat[ing] that based on the R&D data given to [him] at that time, that the real yields for Columbus would be closer to [redacted]." Unfortunately none of [O'Connor's] recommendations [were] followed up."

7. Defendant Cannon's description of normal "start-up" problems mischaracterized the nature of the design problems impacting production. In the letter, O'Connor details his concerns during the "start-up" phase of the Columbus Facility which were communicated to Cannon. O'Connor sent a letter to Defendant Cannon in advance of the 2013 Annual Shareholder Meeting asking "important questions." During a private meeting with Defendant Cannon at the annual shareholder meeting, Cannon responded to O'Connor's questions by telling O'Connor that he was "too negative" and that "[KiOR] [had] made tremendous progress in the last 18 months in R&D." Contrary to Cannon, O'Connor's concerns were validated by fact that "several problems were encountered [during the "start-up" phase] leading to production rates of about only [redacted]% of the actual design case. The first impression was that this was related to 'normal' start-up issues. After an audit . . . in November 2013 it became clear however that the product yields were in fact much lower than projected [redacted], while the on-stream times were also way too low [redacted]."

8. The Columbus Facility's design and technology did not allow for commercial scalability. In or around January 2014, the Board of Directors asked O'Connor to assist KiOR as a "technical expert in reviewing the situation at KiOR." O'Connor started reviewing the "data from Columbus and R&D" and concluded that "the low yields and on-stream times at Columbus were reasonably in line with the results and experience in the DEMO plant in Houston. ***This mean[t] that the main problems at Columbus [were] already discernable in the DEMO***

4

*operations and [were] therefore structural and not 'just' operational issues*." According to O'Connor, the problems at the Columbus Facility can be solved, but "will require a different approach in catalyst selection and operation strategy." O'Connor notes that in February 2014 he "stressed to the [B]oard that . . . a clear change in technology strategy . . . as well as leadership style . . . is essential to solve the issues."

9. O'Connor notes that even today, as KiOR attempts to sell itself, the Company continues to circulate "poorly substantiated projections" which "do not include the crucial learnings from the DEMO [in Houston] and Columbus." In fact, as O'Connor writes, even the projections used to "convince[] the Board" to "build and start-up Columbus" had "not been substantiated in the DEMO [in Houston]." Instead, the "DEMO predicted reasonably well the poor yields and on-stream times at Columbus."

10. O'Connor's resignation letter confirms that the Columbus Facility suffered from structural design problems or, for lack of a more specific term, problems substantively more significant than the mere "start-up" problems conveyed by Defendants during the Class Period. Specifically, O'Connor—a company-insider and scientific expert who communicated directly with Defendants on a repeated basis throughout the Class Period—explains that the Columbus Facility was never suited to produce the yields and/or amounts forecasted.

### THE SEC CONTINUES TO INVESTIGATE KIOR

11. KiOR disclosed in its most recent quarterly disclosure (Form 10-Q) that the SEC's formal investigation remains ongoing. In addition to the SEC's January 28, 2014 subpoena, KiOR received a second subpoena dated July 17, 2014, also "pursuant to a formal order of investigation." KiOR indicated that the subpoena "seek[s] documents about, among

other subject matters, the progress at its Columbus Facility, its projected biofuel production levels and the status of the Company's technology."

| | |
|---|---|
| DATED: | **GASCOYNE & BULLION, P.C.** |
| | By: _____ |
| | James Gascoyne (Fed. No. 1980 / Tx. No. 07744800) |
| | 77 Sugar Creek Center Blvd. |
| | Sugar Land, Texas 77478 |
| | Phone: (281) 340-7000 |
| | Fax: (281) 340-7001 |
| | |
| | *Liaison Counsel* |
| | |
| | **LEVI & KORSINSKY LLP** |
| | |
| | By: _____ |
| | Nicholas I. Porritt, Esq. (*admitted pro hac vice*) |
| | Adam M. Apton, Esq. (*admitted pro hac vice*) |
| | 1101 30th Street NW, Suite 115 |
| | Washington, D.C. 20007 |
| | Phone: (202) 524-4290 |
| | Fax: (202) 333-2121 |
| | |
| | **THE ROSEN LAW FIRM, P.A.** |
| | |
| | By: _____ |
| | Laurence M. Rosen, Esq. (*admitted pro hac vice*) |
| | Phillip Kim, Esq. (*admitted pro hac vice*) |
| | 275 Madison Avenue, 34th Floor |
| | New York, New York 10016 |
| | Phone: (212) 686-1060 |
| | Fax: (212) 202-3827 |
| | |
| | *Co-Lead Counsel* |