UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MICHAEL BERRY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br>                  Plaintiff, <br>     vs. <br><br> KIOR, INC., FRED CANNON, and JOHN K. KARNES, <br><br>               Defendants. | No.: 4:13-cv-2443 <br><br> **PLAINTIFFS' [PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................ 12

PARTIES ........................................................................................................................ 13

CONFIDENTIAL WITNESSES ...................................................................................... 15

BACKGROUND ............................................................................................................. 19

FALSE AND MISLEADING STATEMENTS ................................................................ 22

    November 8, 2012.................................................................................................... 22

    March 18, 2013 ........................................................................................................ 25

    May 9, 2013 ............................................................................................................. 30

    May 29, 2013 ........................................................................................................... 36

THE TRUTH EMERGES THROUGH PARTIAL DISCLOSURES WHILE DEFENDANTS
CONTINUE TO ISSUE FALSE ASSURANCES ........................................................... 38

    July 1, 2013 ............................................................................................................. 38

    August 8, 2013 ........................................................................................................ 41

    September 19, 2013 ................................................................................................. 45

    November 7, 2013.................................................................................................... 46

    December 4, 2013 .................................................................................................... 50

    December 23, 2013 .................................................................................................. 51

    January 9, 2014 ....................................................................................................... 52

    March 17, 2014 ........................................................................................................ 56

THE DEFENDANTS INTENTIONALLY OR RECKLESSLY MISLED INVESTORS .......... 60

    Baseless and Unrealistic Projections to Raise Funds, Service Debt,
    and Continue Operations.......................................................................................... 61

    Accumulated Deficit and Operating Loss ............................................................... 66

    Karnes' Abrupt Resignation ................................................................................... 69

    Insider Trades.......................................................................................................... 70

    Paul O'Connor's Resignation ................................................................................. 82

    SEC Subpoenas ....................................................................................................... 86

PLAINTIFFS' CLASS ACTION ALLEGATIONS........................................................ 87

RELIANCE PRESUMPTION: FRAUD-ON-THE-MARKET DOCTRINE........................... 88

APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* .......................... 90

FIRST CLAIM.................................................................................................................. 91

i

SECOND CLAIM .................................................................................................. 94

PRAYER FOR RELIEF ......................................................................................... 95

JURY TRIAL DEMANDED ................................................................................... 96

Lead Plaintiffs Dave Carlton and Sharon Kegerreis (collectively the "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Second Amended Complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, *inter alia*: (a) review and analysis of relevant filings made by KiOR Inc. ("KiOR" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the internet; and (e) interviews of several confidential witnesses with personal knowledge of the relevant facts.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons who purchased KiOR securities between November 8, 2012 and March 17, 2014, inclusive (the "Class Period"), seeking to recover damages caused by the defendants' violations of the federal securities laws (the "Class"). Excluded from the Class are defendants Fred Cannon ("Cannon") and John H. Karnes ("Karnes") (together with the Company, "Defendants"), the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

1

2.      KiOR is a "clean tech" company that specializes in manufacturing and selling renewable biofuels from cellulose (*i.e.*, plant-derived materials).  As with other "clean tech" companies founded in the wake of the Obama Administration's enactment of The American Recovery and Reinvestment Act of 2009, KiOR has received a substantial amount of funding from tax-payer dollars.  The Brookings Institution estimates that the Obama Administration will have spent over $150 billion towards "clean tech" initiatives by the end of 2014.[1]  To be certain, in February 2011 alone KiOR announced that it received a "Loan Guarantee Term Sheet for over $1 billion" from the U.S. Department of Energy.

3.      Notwithstanding the overwhelming amount of public funding and tax credits, the "clean tech" sensations have largely failed.  Solyndra, Abound Solar, Beacon Power, Fisker Automotive, A123 Systems, and ECOtality are just a handful of examples.  KiOR is the most recent addition to the list.  During a January 2014 broadcast of "60 Minutes," investigative reporter Lesley Stahl interviewed Vinod Khosla, the "father of the Cleantech revolution," during a segment titled "The Cleantech Crash."[2]  Mr. Khosla, who controls over 50% of KiOR's outstanding common stock, provided Ms. Stahl with an overview of KiOR's cellulose conversion process while touring the Company's first commercial scale biofuel facility in Columbus, Mississippi (the "Columbus Facility").  The Columbus Facility, formerly a paper mill, is designed to turn woodchips into fuel.  The key to the conversion lies within a "magic catalyst" which, when applied to the woodchips, creates "something that looks just like crude oil" in a matter of seconds through a "thermo-chemical reaction."  The crude-like substance is then

---

[1] Jesse Jenkins, et al., Beyond Boom & Bust: Putting Clean Tech on a Path to Subsidy Independence 4 (2012).

[2] *60 Minutes: The Cleantech Crash* (CBS television broadcast Jan. 5, 2014) (transcript available at: http://www.cbsnews.com/news/cleantech-crash-60-minutes).

distilled on-site into "clean green gasoline."  In response to Mr. Khosla's explanation, Ms. Stahl offered an apt reply: "You make it sound almost – sorry – too good to be true."  In fact it was.

*The Columbus Facility*

4.     This lawsuit centers on KiOR's Columbus Facility.  Defendants intended the Columbus Facility to produce hydrocarbon-based oil from biomass on a commercial scale.  The production process comprised four stages: biomass processing, biomass fluid catalytic cracking ("BFCC"), product recovery, and hydrotreating.  Generally speaking, the Columbus Facility would mill timber into small wood chips, transfer the wood chips to tanks where KiOR's proprietary catalyst would be applied, and then refine the finished product to meet specifications.

5.     KiOR commenced construction of the Columbus Facility during the first quarter of 2011.  KiOR "mechanically completed" the Columbus Facility in April 2012, which meant essentially that the Columbus Facility was built and ready to be commissioned.  KiOR's "commissioning" phase ran from April 2012 through September 2012, which Defendants described as "the process to verify that [the Columbus Facility] [was] fully functional and fit to purpose."[3]  KiOR completed the "commissioning" phase in September 2012, allowing the Columbus Facility to enter the "start-up phase."

6.     KiOR's Columbus Facility would remain indefinitely in the "start-up phase" despite repeated promises and assurances from the Company's Chief Executive Officer ("CEO") and former Chief Financial Officer ("CFO"), Cannon and Karnes, respectively, that the Columbus Facility was "turning the corner towards steady state operations" and that the "very, very typical" start-up issues would be resolved.  It would later be revealed that these purported "start-up issues" were the very same severe mechanical design problems underlying Defendants'

---

[3] *See* KiOR Form 10-Q, filed November 14, 2011, p. 25.

3

ultimate decision to shutdown the Columbus Facility in its entirety in the first quarter of 2014.Only recently, in the Company's annual disclosure filed on Form 10-K with the SEC on March 17, 2014 ("2013 10-K"), well after a year past the initial goal for steady state commercial production, did KiOR reveal the severity of the Columbus Facility's mechanical design problems.  Contrary to the manner in which Cannon and Karnes repeatedly downplayed these problems as start-up glitches, Defendants informed investors they had "elected" to suspend "further optimization work" in favor of shutting down the Columbus Facility completely and return to the proverbial drawing board to perform "additional research and development."  The particular issues in need of additional research and development related particularly to "structural bottlenecks, reliability and mechanical issues, and catalyst performance."[4]

7.      In the same 2013 10-K, Defendants also revealed that the Company had been served with a subpoena by the SEC on January 28, 2014, "pursuant to a formal order of investigation, seeking documents about, among other subject matters, the progress at [the] Columbus [F]acility and the timing of projected biofuel production levels."  Approximately eight months later, in August 2014, the Company revealed that it received a second subpoena from the SEC.  As indicated in its Form 10-Q filed on August 11, 2014, KiOR received a second subpoena dated July 17, 2014, also "pursuant to a formal order of investigation."  KiOR indicated that the subpoena "seek[s] documents about, among other subject matters, the progress at its Columbus Facility, its projected biofuel production levels and the status of the Company's technology."

<u>Misrepresentations and Omissions</u>

8.      Throughout the Class Period, Defendants misled investors concerning the timing

---

[4] *See* 2013 10-K at 3.

of projected production levels of biofuel at the Columbus Facility.  Specifically, despite constant setbacks, mechanical and design problems, and missed milestones, Defendants continued to falsely reassure investors that the Company remained on track to achieve commercially meaningful biofuel production levels at the Columbus Facility during the timeframes promised.

9.    In one particularly egregious example, Karnes, KiOR's former CFO, assured investors during a November 8, 2012 earnings call that the Company would be able to meet its production estimate of between 500,000 and 1,000,000 gallons of blend stock sales before the end of 2012.  For this to occur, KiOR needed to produce over 9,400 gallons of product per day every day over the course of the following 53 days.  The Company later revealed that the Columbus Facility had in fact failed to commence "production operations" at the Columbus Facility during 4Q12.  Cannon offered the following response:[5]

> I do recognize however that many of you were expecting us to commence commercial shipments late last year, consistent with our guidance from our last conference call. Did we set an *aggressive target* for ourselves? Yes. Am I disappointed that we missed our target? Absolutely yes. Did we encounter unexpected startup issues unrelated to our technology? Yes we did. *However, we have overcome these normal startup issues and have proven that KiOR's proprietary biomass to fuels technology works at commercial scale at Columbus.*[6]

10.    Cannon's "target" was severely reckless, not "aggressive."  As of November 8, 2012, when Cannon reaffirmed the production guidance, the Columbus Facility had produced zero gallons of fuel.  Moreover, Cannon was aware that the Columbus Facility's longest on-stream run-time (*i.e.*, continuous operation or continuous production) at that point had been *three* days.  Cannon's estimate was not grounded in reality and only served to mislead investors as to the true status of the Columbus Facility's operations.

---

[5] All conference call excerpts were obtained from transcripts provided by either the Company or Seeking Alpha.
[6] Certain statements, or portions thereof, have been italicized or bold-faced for emphasis.  Unless stated otherwise, all italicized and bold-faced font style has been added for emphasis and does not appear in the original.

11.     In another example, during the Company's 1Q13 earnings conference call on May 9, 2013, KiOR's CEO Cannon touted that KiOR and its Columbus Facility were "running as expected" and on track to produce between 300,000 and 500,000 gallons before the end of 2Q13 on June 30, 2013.  In reality, the Company had not shipped a single gallon of fuel at any point during the second quarter and, as revealed in a subsequent press release, would in fact continue to ship nothing until June 28, 2013.  For KiOR to meet Cannon's May 9, 2013 forecast, the Columbus Facility would have had to produce roughly 5,800 gallons per day every day for the remainder of the second quarter, which totaled 52 days.  Cannon's forecast was wildly misleading given that he knew that at this point in time the Columbus Facility had failed to operate on an uninterrupted basis for even 30 days, let alone 52.

12.     Contrary to Cannon's assurances, KiOR had not overcome the start-up issues plaguing the Columbus Facility.  The following chart displays just how severe and persistent the start-up issues were:[7]

---

[7] The following chart contains information obtained from KiOR's quarterly and annual financial reports filed with the SEC during the Class Period, as well as earnings conference calls hosted by Cannon and Karnes.



**KiOR Columbus Facility Start-Up Costs
Estimated vs. Actual**

\* Estimates represent total remaining start-up costs, except for 2Q13 and 3Q13 estimates which estimated start-up costs to be incurred in following quarter only.

13.     As the above chart indicates, Defendants spent approximately $2 million in 1Q12, $6 million in 2Q12, $10 million in 3Q12, etc., through the present day for a total of over $70 million, *compared to an initial estimate of only $16 million*, without even coming close to operating the Columbus Facility at its 13 million gallon nameplate capacity.  Regardless of the consistently increasing start-up costs, Defendants would falsely represent that the Company had made significant progress towards obtaining steady state operations.  Each quarter, Defendants would claim that less and less money would be needed to achieve commercial production: in 1Q12, Defendants estimated remaining start-up costs to be $16 million, $10 million in 2Q12, $6 million in 3Q12, etc.  Contrary to the numerous promises made by Cannon and Karnes as to the Columbus Facility's imminent "lining-out," KiOR spent millions of dollars each quarter repairing what was misleadingly referred to as "very, very typical" start-up issues.  Given Cannon and Karnes' positions within the Company and the importance of the Columbus

7

Facility's production capabilities, they were very aware of these intensifying costs and their plant managers' apparent futile efforts to subdue them.

*The Truth*

14.     The Columbus Facility's severe design problems were apparent to everyone within just a few days of entering the "start-up" phase in September 2012 according to information obtained from confidential witnesses.  Specifically, former operations employees described severe design problems with respect to various aspects of the Columbus Facility's technology, including but not limited to the bio-oil fractionation, Vapor Recovery Unit ("VRU"), and woodchip feeding systems.  Asked whether the "start-up" problems were design issues, one confidential witness replied, "the whole damn thing was a design issue.  It was hastily put together and they were trying to make it run."

15.     Several former operations and production employees from within KiOR's Columbus Facility recall specific and repeated instances of mechanical failures.  These former employees, identified herein as "confidential witnesses," were each substantively involved in the Columbus Facility's operations and start-up at various points between June 2012 and September 2013.  As explained by these former employees, the Columbus Facility's biomass processing was severely hindered and flawed due to mechanical problems relating to the woodchip feeding and/or conveyer system.  One former employee recalled the conveyer could not provide the Columbus Facility's machines with the proper amount of woodchips, which resulted in unexpected shutdowns and failures.  In other aspects of the production process, the Columbus Facility faced different design problems, such as excessive tar build-up and the undersizing of certain critical machinery.

8

16.     For over a year, Defendants misleadingly referred to these ongoing design problems as typical start-up glitches.  Then, during an investor conference call on January 9, 2014, the Company revealed that it would be temporarily shutting down the Columbus Facility in order to commence an "optimization project[]" to address certain areas of operation.  While CEO Cannon explained that the "project" was "designed to address the three key drivers of [the] Columbus[] [Facility's] performance: throughput, yield and overall process efficiency and reliability," the true extent of the Columbus Facility's problems was not revealed until the Company released its 2013 annual disclosure filing (Form 10-K) several months later.

17.     As stated in the 2013 annual filing (Form 10-K), Defendants would be shutting down the Columbus Facility indefinitely because "structural bottlenecks, reliability and mechanical issues, and catalyst performance."  In other words, the very same problems once portrayed by Defendants as typical start-up glitches were now the underlying critical reasons behind the Company's decision to suspend operations at the Columbus Facility.

### *The Fraud*

18.     KiOR's ability to survive as a going concern depended on the news coming out of the Columbus Facility.  Throughout KiOR's quarterly and annual filings with the SEC during the Class Period, the Company repeated that the "[t]he lack of any committed sources of financing . . . raises substantial doubt about [KiOR's] ability to continue as a going concern" and that KiOR's ability to secure additional financing "[would] be contingent upon, among other things, successful start-up of [its] Columbus Facility . . . ."  Cannon and Karnes needed to make the Columbus Facility sound as promising as possible in order to avoid a complete collapse of the Company.  Therefore, Defendants delayed disclosing the true state of the Columbus Facility for

over an entire year while deceiving investors all along.

19.     Over the course of the Class Period, the Company's net operating losses and accumulated deficits increased by roughly 60%.  In September 30, 2012, KiOR held "cumulative operating net losses of $175.2 million and an accumulated deficit of $197.1 million."  By the following year, KiOR had "generated $299.3 million of operating losses and an accumulated deficit of $339.7 million."  Without any substantial revenue, the Company required hundreds of millions of dollars in debt financing.  While the terms of the loans allowed certain interest payments to be satisfied through warrants, the value of the warrants depended on the Company's stock price.  Consequently, to keep the Company afloat, Cannon and Karnes perpetuated the misrepresentations about the viability and production capabilities of the Columbus Facility so as to keep KiOR attractive to prospective investors.

20.     KiOR's cash flow and debt problems were amplified by the terms of its loan with the Mississippi Development Authority (the "MDA Loan").  In exchange for $75 million in investment, KiOR promised to "make specified investments within Mississippi by December 31, 2015, including an aggregate $500.0 million investment in property, plant and equipment located in Mississippi and expenditures for wages and direct local purchases in Mississippi totaling $85.0 million."  Failure to do so would (and quite possibly will) trigger a default resulting in "the acceleration of repayment amounts due under the loan agreement."  The MDA Loan, of course, is secured by KiOR's equipment, land, and buildings.  The only way KiOR would have been (or will be) in a position to satisfy its investment obligations under the MDA Loan was to successfully draw enough investment to facilitate the construction of its planned second commercial production facility either in Natchez, Mississippi (the "Natchez Facility"), or

adjacent to the Columbus Facility (the "Columbus Facility II"). However, as stated previously, KiOR's ability to secure additional financing "[would] be contingent upon, among other things, successful start-up of [its] Columbus Facility . . . ." Without the successful portrayal of the Columbus Facility, KiOR was not going to be able to secure the financing necessary to construct its second commercial production facility, was not going to be able to satisfy its obligations under the MDA Loan, and would have been responsible to repay its $75 million on an accelerated basis. Such a default would have been (and may still be) catastrophic to the Company.

21. Aware of the precarious state of the Company and cognizant of the fact that the truth about the Columbus Facility would soon be revealed, Defendants Cannon, Karnes, and other members of the executive management team, directors, and significant shareholders, sold off significant amounts of KiOR stock at artificially inflated prices throughout the Class Period. The following chart indicates the timing of these insider trades relative to the Columbus Facility's "start-up phase" and ultimate shutdown:



   – Insider stock sale transactions

22. As illustrated by the above chart, the majority of the insider trades (including

11

trades by Defendants Cannon and Karnes) were made during the "start-up phase" and on the eve of the announcement that the Columbus Facility would be shutting down.  In total, by selling stock prior to the release of the Company's 2013 10-K, these insiders profited by over $6.2 million.

23.    Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) the Company was not on track to produce commercially meaningful quantities of biofuel at the Columbus Facility at the timetables provided by the Company; (b) contrary to KiOR's public statements, the delays and lack of production at the Columbus Facility were attributable to design deficiencies; (c) the Columbus Facility required numerous operational, design and equipment changes costing tens of millions of dollars just to move toward commercially meaningful production of biofuels; and (d) additional mechanical improvements were required after over a year of repairs in order to obtain yields of biofuel that would create a sustainable business.  When promised productions were not met, Defendants issued false reassurances to investors.

24.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

25.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the

SEC (17C.F.R. §240.10b-5).

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company's headquarters are located in this District.

28.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

29.     Court-appointed Lead Plaintiffs Dave Carlton and Sharon Kegerreis each purchased KiOR common stock during the Class Period and have suffered damages as a result. Lead Plaintiffs' certifications were previously filed with the Court in connection with their respective motions for appointment as Lead Plaintiff, and are incorporated herein by reference.

30.     Defendant KiOR is a Delaware corporation with its headquarters located at 13001 Bay Park Road, Pasadena, Texas, 77507. Its common stock is traded on NASDAQ under the ticker symbol "KIOR."

31.     Defendant Fred Cannon has served at all relevant times as the Company's President, CEO, and a member of the Company's Board of Directors.  On March 26, 2014, Cannon resigned as President.  Cannon joined KiOR in 2008 as President, Chief Operating Officer, and a director.  In July 2010, Cannon was appointed CEO.  Prior to KiOR, Cannon spent 30 years in the fluidic catalytic cracking industry with AkzoNobel Catalysts LLC.  Cannon is

experienced in the refining catalyst business.

32.     Defendant John H. Karnes has served at all relevant times as the Company's CFO.  Karnes joined KiOR in February 2011.  On December 1, 2013, Karnes unexpectedly submitted his resignation as CFO of KiOR effective December 3, 2013.  Upon information and belief, Karnes was forced to resign as a result of the fraud alleged herein.

33.     Cannon and Karnes are collectively referred to herein after as the "Individual Defendants."

34.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

35.     KiOR is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

36.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to KiOR under *respondeat superior* and agency principles.

## CONFIDENTIAL WITNESSES

37.     Confidential Witness No. 1 ("CW1") was a "Commissioning and Start-Up Consultant" for KiOR between June 2012 and February 2013.  CW1 reported directly to the Columbus Facility's former Operations Superintendent at KiOR (who is described below in detail as Confidential Witness No. 2).  While at KiOR, CW1 worked with the Columbus Facility's Biomass Fluid Catalytic Cracking system, hydrotreater, VRU, and biofuel feeding system.  Prior to working at KiOR, CW1 spent three years in the petroleum, chemical, and power industries focusing on project management and engineering.

38.     CW1 confirmed that technology specific design issues existed within the Columbus Facility.  CW1 identified the VRU (Vapor Recovery Unit) in particular as having significant design flaws giving rise to production shortfalls.  According to CW1, the VRU was a persistent, ongoing problem that would need to be redesigned before being able to run smoothly.

39.     Confidential Witness No. 2 ("CW2") was KiOR's former "Operations Superintendent" for the Columbus Facility from June 2012 through February 2013.  CW2 reported directly to CW4, the Columbus Facility's "Operations Manager," who reported directly to Greg Neve, the Columbus Facility's "Plant Manager."  CW2 advised that CW1, CW2, CW4,

and Greg Neve all left KiOR in February 2013.  When asked why, CW2 said that they all "saw the writing on the wall" and "everyone started looking" for new employment.  While at KiOR, CW2 was responsible for the day-to-day running of the Columbus Facility.  CW2 also worked with operators and maintenance staff to reach daily production goals at the Columbus Facility. CW2 worked indirectly with Cannon and Karnes.  CW2's supervisor, the "Operations Manager," had direct contact with Cannon and Karnes.   Prior to working at KiOR, CW2 spent approximately 22 years in project planning and plant commissioning.  CW2 has commissioned multiple refineries and possesses experience with regard to crude oil units, vacuums, cracking units, steam methane reforming systems, liquefied neutral gas systems, coke machinery, and other similar industry processes.

40.    CW2 confirmed that the Columbus Facility had "operational problems" stemming from "design issues."  CW2 attended "operational meetings everyday" with the "Plant Manager" to discuss plant and production issues.  CW2 confirmed that the Columbus Facility was burdened by "all kinds of problems" during the "start-up" phase.  CW2 identified several problems in particular.  CW2 confirmed that certain equipment at the Columbus Facility was undersized and could not handle the wastewater byproduct being produced.  CW2 also confirmed that the fractionating system was prone to buildup of excess tar, which led to equipment jams.  CW2 further confirmed that the woodchip feeding system used to feed the Columbus Facility's conversion system was unable to properly supply the systems with sufficient biomass to maintain constant operations.  CW2 explained that the feeding system initially was unable to properly supply the woodchips into the system (*i.e.*, the feeding system "kept plugging up").  Moreover, the feeding system was unable to properly retain the woodchips while feeding them into the

system because of leakage.  CW2 advised that without sufficient woodchips, the "charge rate woodchip system" would shutdown.  CW2 recalled several blackouts occurring in November 2012, the longest two lasting between two and six hours.  CW2 confirmed that the Columbus Facility was unable to produce enough of its own power to keep running during the blackouts. CW2 confirmed that engineers from KiOR's Texas office traveled to the Columbus Facility on a regular basis to discuss facility issues during meetings attended by CW2.  With regard to the ongoing problems at the Columbus Facility, CW2 confirmed that "the whole damn thing was a design issue.  It was hastily put together and they were trying to make it run."  CW2 also confirmed that within just a few days of operations, these problems at the Columbus Facility were apparent to everyone.

41.    Confidential Witness No. 3 ("CW3") was a millwright at the Columbus Facility during the summer of 2013.  CW3 recalled that the Columbus Facility was not running between July and August of 2013.  In August 2013, towards the end of his employment at the Columbus Facility, he observed an entire tank filled with tar-like substance instead of fuel product. According to CW3, this tar-like substance was responsible for many failures along the production line because it would cause the various mechanical components, including pumps, to jam and require maintenance.  CW3 also recalled persistent problems with the conveyer systems and, in particular, they would jam and severely delay the introduction of biomass into the Columbus Facility systems.

42.    Confidential Witness No. 4 ("CW4") was the Columbus Facility's Operations Manager at KiOR from September 2011 through February 2013.  He reported to Plant Manager Greg Neve.  CW4 attended daily operational meetings at the Columbus Facility with plant

managers and engineers from KiOR headquarters in Pasadena, Texas.   When discussions concerning design issues and/or technical problems at the Columbus Facility arose, Defendant Cannon and other senior management would be notified as soon as possible by Process Engineers, Plant Managers, and/or Production Engineering Staff.

43.    CW4 recalled specific equipment issues at the Columbus Facility, including the wood chipping unit, the BFCC, and the VRU.   Specifically, CW4 concluded that certain equipment (*e.g.*, the catalyst cooler on the BFCC) was undersized because there were catalyst formulation problems.   CW4 also recalled that the wood chipping unit creating problems for the production process, because it was undersized due to the fact that the operation frequently struggled with correct feed rates and actual processed tons.   According to CW4, senior management was aware of these mechanical and design problems because they were discussed constantly.

44.    Confidential Witness No. 5 ("CW5") provided maintenance services at the Columbus Facility for two weeks in September 2013.   While employed at the Columbus Facility, CW5 reported to Jarrell Slaughter of Austin Industrial, who served as a Site Manager at the Columbus Facility on behalf of Austin Industrial.   Austin Industrial was a primary on-site maintenance contractor for KiOR at the Columbus Facility during the "start-up phase."   CW5 spent the majority of his time repairing the wood chipping and conveyer systems.   CW5 described the wood chipping process as pine wood running through various chippers and then being dumped onto a conveyer where the wood would receive additional treatment before being refined through the catalyst process.   CW5 recalled that the "small hog" repeatedly failed while the "main hog" went down twice in the course of his employment at the Columbus Facility.   To

18

repair the "main hog," CW5 and others had to work three 12-hour shifts.  CW5 recalled that KiOR had purchased new blades in an attempt to fix the issue, but the blades were improper in terms of size.  Rather than returning the blades, KiOR staff attempted to alter the blades in the field.  CW5 believed that senior management was "definitely aware" of the various problems relating to the wood chipping system because the Columbus Facility Engineers and Operations Managers all knew about the ongoing problems.

## **BACKGROUND**

45.     KiOR purports to be a renewable fuels company, producing cellulosic gasoline and diesel from abundant non-food biomass, such as wood chips, grasses, and non-edible portions of plant.  The Company's proprietary catalytic process produces cellulosic gasoline and diesel from lignocellulosic biomass.  The Company's cellulosic gasoline and diesel are hydrocarbon fuels similar to their traditional petroleum-based counterparts.

46.     KiOR's technology worked in four stages: biomass processing, biomass fluid catalytic cracking (BFCC), product recovery, hydrotreating and fractionation.  As explained by the Company in its initial Registration Statement / Prospectus filed with the SEC on June 24, 2011 ("2011 Registration Statement"), biomass is processed and then fed into the BFCC reactor where it mixes with KiOR's "proprietary catalyst systems."  The resulting mixture of renewable crude oil, byproducts, and leftover catalyst exists the BFCC reactor and enters a "separator" where the leftover catalyst is removed and transferred to a "catalyst regenerator" and recycled; the renewable crude oil and byproducts are transferred from the "separator" to a "product recovery unit" for refining.  The refined mixture proceeds to a "hydrotreating unit" for further processing into either gasoline, diesel, or fuel oil "blendstocks."  2011 Registration Statement at

79.  KiOR's 2011 Registration Statement offers the following chart[8]:



47.    KiOR purportedly completed demonstrating and validating the efficacy of its technology through laboratory testing at its pilot testing (or demonstration facility) unit outside of Houston, Texas.  According to KiOR, the pilot unit was designed to process 10 bone dry tons ("BDT") per day of biomass to be converted into fuel products.   In other words, the demonstration facility was capable of converting 10 tons of wood (or wood pulp) at zero percent moisture content into fuel blendstocks on a daily basis.

48.    KiOR's business plan was to incrementally scale this technology to show investors to that the technology could scale up in size to be a commercially viable producer of renewable fuel.  KiOR would finance this through debt and equity raisings and governmental loans.

49.    KiOR's first step toward commercialization was the completion of an initial-scale

---

[8] Additional information can be found at KiOR's "Virtual Plant Tour" on YouTube.  *See KiOR Virtual Plant Tour – September 2012* (Oct. 18, 2012) (available at: https://www.youtube.com/watch?v=VXFV01lhYfM).

commercial production facility in Columbus, Mississippi (the Columbus Facility).   The Columbus Facility was designed to process **500 BDT per day** and produce up to **13 million gallons** of cellulosic diesel and gasoline per year.

50.   In April 2012, KiOR completed mechanical construction of the Columbus Facility.  The total cost was $213 million.

51.   Assuming it would be able to demonstrate that the technology could scale up and reliably produce fuel at the Columbus Facility, KiOR intended to raise enough capital to construct a second commercial production facility in Natchez, Mississippi (the Natchez Facility). The Natchez Facility was said to be designed to use **1,500 BDT per day** and produce up to **40 million gallons** of cellulosic diesel and gasoline per year.  KiOR initially estimated that it would cost $460 million to build this second facility.

52.   To fund the construction and outfitting of the Columbus Facility and to fund the Company's operations, KiOR relied on loans and equity financings—as KiOR did not generate any material revenue or sales.  KiOR had an incentive to maintain a high stock price.  KiOR regularly issued warrants to purchase KiOR common stock as part of its financings or to renegotiate debt.  For example, on January 26, 2012, KiOR entered into a $75 million loan and security agreement with certain lenders.  During the Class Period, certain payments due on the loan were made through warrants to purchase KiOR stock, in lieu of cash, based on average price per share thresholds of KiOR common stock.  KiOR had also issued warrants to renegotiate equipment loans.

53.   Because KiOR constantly needed a flow of cash through new investment and loans to operate, build out, and grow its business, it was under intense pressure to provide good

21

news out of the Columbus Facility.

## FALSE AND MISLEADING STATEMENTS

*November 8, 2012*

54.     On November 8, 2012, the Company held a conference call to discuss its results for the third quarter ended September 30, 2012.  During the call Cannon acknowledged that the Company failed to meet its stated goal of commencing operations in September.  Cannon stated in relevant part:

> Starting first with Columbus. Recall on our last earnings call in August, I said, we planned to commence start-up operations at the facility in September and to make our first commercial shipments during the October, November timeframe. In this regard, I'm pleased to report, that we started production at the Columbus facility in October. **Our proprietary technology is operating as designed at commercial scale and producing a high quality renewable crude oil, conforming to our design specs**. We have also been building our oil inventory and anticipating, commencing, upgrading operations in the next week or so.

> **All of this gives me confidence, that we will share of the world's first cellulosic gasoline and diesel fuel products on schedule later this month.** I will give you a bit more color on the facility start-up and performance, but first, I want to take stock of what we have accomplished getting to this point and what to add then a production at Columbus means for the U.S. generally and the renewable fuel sectors specifically.

55.     During the call Cannon falsely reassured investors that he was "extremely pleased with the performance of [KiOR's] technology at Columbus.  [KiOR's] testing and operations to date have proven that all of the proprietary aspects of KiOR's production process work at a commercial scale."  Cannon continued to falsely reassure investors that the only issues arising were normal start-up and "very, very typical" issues with a plant start-up.

> <Q – [Analyst]>: Thanks for taking my question. Hi, Fred and Mark.
> First question, Fred, just wanted to get a sense of what was the longest continuous operation at Columbus, and maybe you could talk about some of the start-up issues, and also give us a sense of – it seems like the proprietary parts are working

22

as you had expected. So could you maybe give us some sense of where the yields are coming, where you expect the yields to be in next 12 months or so?

<A - Fred Cannon>: Okay. Sure. We've run a few days, three days in a continuous production where we've run everything in the plant from wood chips to high-quality oil. And then a portion the start-up, which is extremely normal you run in the short periods and you find things that need correcting. **We've had normal kind of start-up things, the solenoid valve on the cogeneration unit went out and shut us down. Things like that, we've had leaks, which is – on the flue gas, which is very typical of start-up, pumps seals and other things. Just, very, very typical.** As far as the KiOR proprietary technology, we're extremely pleased. We have a converter that circulates catalyst extremely well, we're extremely pleased with that, and we've tested the whole plant, we've run the whole plant on our own generated power from the cogen that's fully operational. So it's been more the normal start-up things, whether this was a KiOR plant, or refinery, or a petrochemical plant, it's the normal start-up things. …

56.    During the same call Karnes falsely assured investors about the Columbus Facility by reiterating that for the fourth quarter 2012 "prior guidance of around 500,000 gallons." Karnes stated as follows:

Turning now to our expectations around Columbus' performance for the fourth quarter. As I mentioned last quarter, we just do not have sufficient production history from the plant to allow us to formulate guidance on yields or utilization, but **we do think our prior guidance of around 500,000 to one million gallons of blend stock sales, seems like a reasonable planning** cases something that start-up continued as we got to planned and assuming the EPA promulgates for renewable gasoline pathway, I'll discuss in a minute.

57.    The Company issued a press release in conjunction with the earnings call. The press release, dated November 8, 2012, continued to tout the commercial viability of its biofuel production, reporting to investors that:

"I am pleased to announce that we have commenced operations at the Columbus facility and have produced a high quality oil that is in line with our specifications for upgrading into cellulosic gasoline and diesel," said Fred Cannon, KiOR's President and Chief Executive Officer. "More importantly, we believe the high quality of the oil from the Columbus facility validates KiOR's proprietary biomass fluid catalytic cracking, or BFCC, technology at commercial scale. **The facility's performance to date not only meets our expectations based on our experience**

**at our pilot and demonstration scale facilities, but also gives me confidence that we remain on track to upgrade our oil in order to ship America's first truly sustainable cellulosic gasoline and diesel for American vehicles**."

58.     The above bold-faced statements in ¶¶ 54, 55, 56, and 57 were false and misleading because (i) the statements materially misled investors to believe that the Columbus Facility's "start-up phase" was progressing as designed and intended and/or (ii) the statements omitted material information concerning the then-existing atypical, significant design and mechanical flaws affecting operations at the Columbus Facility.  Specifically, as recalled by former employees at the Columbus Facility and confirmed by Defendants in KiOR's 2013 10-K, the Columbus Facility had been experiencing the following problems during the "start-up phase" prior to the making of the above statements: specific design issues existed within the Columbus Facility, including the Vapor Recovery Unit affecting the overall yield and efficiency aspects of production (CW1); certain equipment within the Columbus Facility was undersized and could not handle wastewater byproduct generated by the BFCC reaction process (CW2); the BFCC reactor was prone to excess tar build-up, which led to equipment jams and additional repair (CW2); biomass processing was flawed due to the woodchip conveyer system not being able to sufficiently feed the converter because it "kept plugging up" (CW2); the production process would frequently shutdown unexpectedly due to shortages of biomass caused by the faulty biomass conveyer system (CW2); insufficient sizing of the catalyst cooling component for the BFCC reactor (CW4); and the wood chipping unit and conveyer system did not properly supply the converter at sufficient rates (CW4).  This information concerning the true status of the Columbus Facility was material because it would have been considered by a reasonable investor in the course of evaluating KiOR's operations and potential and deciding whether or not to

24

purchase KiOR's stock.

59.    Moreover, Defendant Karnes' guidance of between "500,000 to one million gallons of blend stock sales" (identified in bold-face in ¶ 56) was especially misleading and/or deliberately reckless.  Given (i) the severe start-up problems being encountered by the operations staff (*supra*, ¶ 58), (ii) the fact that the Company "ha[d] not yet commercialized [or produced] its cellulosic gasoline and diesel nor ha[d] it generated any revenue as of September 30, 2012" and "[did] not expect to do so until at least the fourth quarter of 2012" (KiOR Form 10-Q filed November 14, 2012 ("3Q12 Form 10-Q"), at 10, 22, 23), and (iii) Defendants' stated expectation that that the remainder of the start-up phase would involve "many start-ups and shutdowns that [would] disrupt and delay [KiOR's] production activities for significant time periods" (3Q12 Form 10-Q, *infra*, p. 34), the Columbus Facility was utterly incapable of **selling** (as opposed to **producing**) between 500,000 and 1,000,000 gallons of blend stock sales before the end of the year, a period of **less than two months** from the date of the November 8, 2012 investor conference call.  For Defendants' prediction to be accurate, the Columbus Facility would have had to produce over 9,400 gallons of on-specification product per day every day through the end of the year in order to meet just the lower bound of the forecast.

*March 18, 2013*

60.    On March 18, 2013, the Company issued a press release announcing that its first shipment of cellulosic diesel was being shipped from the Columbus Facility—several months behind the late November date Cannon promised to investors during the November 8, 2012 conference call.  The press release was attached to KiOR's Form 8-K filed on March 18, 2013, as Exhibit 99.12.  In the press release Cannon falsely touted the commercial scalability of the

Company's technology:

> " . . . **This facility demonstrates the efficacy of KiOR's proprietary catalytic biomass-to-fuel process with the potential to deliver cellulosic gasoline and diesel to the U.S.** We are proud to be making history in Mississippi. The technology is simply scalable and we believe sufficient excess feedstock exists in the Southeast alone to build almost fifty KiOR commercial scale facilities."

61.     During an earnings conference call the same day, on March 18, 2013, the Company falsely reassured investors about the viability of its production of biofuel at the Columbus Facility even though it acknowledged that it had failed to commence commercial shipments as previously promised by the Company—let alone have "500,000 gallons of blend stock to one million gallons of blend stock sales" Karnes reaffirmed during the November 8, 2012 conference call.  The Company claimed that purported normal startup issues contributing to delays had been overcome.  Defendant Cannon stated in relevant part:

> As our last update in November, we have made substantial progress in addressing all three of these risks. Yesterday our Columbus facility made the world's first commercial shipment of cellulosic diesel fuel, the most important step in answering the remaining questions surrounding our scale up risk. With this shipment, we have now operated our proprietary biomass to fuel platform from beginning to end at commercial scale, with the final hydrocarbon products, gasoline and diesel produced by our facility on specification and ready to drop into American cars and trucks.
>
> . . .
>
> I do recognize however that many of you were expecting us to commence commercial shipments late last year, consistent with our guidance from our last conference call. Did we set an aggressive target for ourselves? Yes. Am I disappointed that we missed our target? Absolutely yes. Did we encounter unexpected startup issues unrelated to our technology? Yes we did. **However, we have overcome these normal startup issues and we have proven that KiOR's proprietary biomass to fuels technology works at commercial scale at Columbus**.

62.     Cannon then told investors that for the remaining nine months of 2013,

26

production would be between 3 to 5 million gallons. Cannon stated in relevant part:

> Now, our focus at Columbus turns towards achieving steady state operations. Until we have the facility fully lined down, which we believe could take at least nine months, any guidance that we might give to the basic metrics of plant performance that we use in petrochemicals or have to have an unusually wide error bar around that. **Given what I just said about the fact that production volumes in the first quarter will be negligible, looking at the remaining nine months of the year, we believe our volume expectations to be approximately 3 to 5 million gallons for the balance of the year**. We have learned a lot at Columbus over the last several months and we believe we can apply the learnings from Columbus to the engineering and design of Natchez.

63.     Karnes affirmed the production guidance:

> Columbus on the other hand is not just straightforward to provide guidance on. As Fred mentioned, while we've commenced shipments but have not cut over yet to reaching or extended operations and we don't expect to be cut over for some time. As a result shipments can be expected to be a bit sporadic as units operations are optimized over the months again, gradually smoothing later in the year as the plants focus turns from lining out to maximizing utilization and efficiency. **Until then though, for planning purposes we are assuming that our 2013 total production target of 3 to 5 million gallons will simply occur linearly starting from essentially zero in Q1**.

64.     Cannon also reiterated that half of the delay was attributable to again "normal startup issues" and not a technology or plant design issue. Cannon stated in relevant part:

> <Q – [Analyst]>: Good morning, Fred. Good morning, John, and congratulations on selling the first cargo of diesel. I guess you'll sell gasoline once the EPA has approved a pathway, I guess soon. But I guess the first question from my side is really around the startup issues. You say unrelated to technology, and these are just normal issues in terms of lining out a plant. Can you give us some color on some of the issues that you've run into and that you are overcoming?

> <A – Fred Cannon>: Sure, Ed. **I think probably in the big picture they're all normal startup issues unrelated to our technology**. We had one event which was probably account for almost half of our total delay and our actual production of fuel and that was in late November a total blackout in the city of Columbus which also blacked out the KiOR plant. It happened at probably the worst possible time it could happen when the plant was not fully running at rate, which of course then we supply our own power. So it's not a thing. So to have on a very cold night a total blackout caused obviously, just like a refinery, a lot of pluggage and that

took us many weeks to work through and then some residual after that. **And then the other was just normal startup things of getting it in optimal operation. But thank goodness we have all that behind us now and we've made fuel**. So we're quite excited about that.

65.     Cannon reiterated, and even stressed, the normalcy and typicality of the problems being encountered at the Columbus Facility:

<Q – [Analyst]>: Hi, Fred and John. Thanks for taking my question. Just first question about the Columbus startup. Fred, wondering if you could give us some more color on the rate or the frequency of production and the consistency of production versus your design rates. Specifically, Fred, what I'm interested in knowing, are you seeing a batch that produces close to design rates and then you have a bunch of bad or lower efficiency batches? Or are you seeing more gradual improvement in your batch to batch? Thank you.

<A – Fred Cannon>: Yes. Now, what we're seeing Columbus is just operability issues and that can be a pulp. **It can be in a control valve, other things that are very, very normal when you're starting up a plant**. **Technology, the chemistry, we couldn't be more happy about**. **Every time the converter runs it makes a very, very high quality beautiful oil** and now we've commissioned and run the upgrading section and product quality we couldn't be more happy with. So it's just mechanical, operational things that we just have to work through and get the reliability up.

66.     The above bold-faced statements in ¶¶ 60, 61, 62, 63, 64, and 65 were false and misleading because (i) the statements materially misled investors to believe that the Columbus Facility's "start-up phase" was progressing as designed and intended and/or (ii) the statements omitted material information concerning the then-existing atypical, significant design and mechanical flaws affecting operations at the Columbus Facility.  Specifically, as recalled by former employees at the Columbus Facility and confirmed by Defendants in KiOR's 2013Y Form 10-K, the Columbus Facility had been experiencing the following problems during the "start-up phase" prior to the making of the above statements: specific design issues existed within the Columbus Facility, including the Vapor Recovery Unit affecting the overall yield and

efficiency aspects of production (CW1); certain equipment within the Columbus Facility was undersized and could not handle wastewater byproduct generated by the BFCC reaction process (CW2); the BFCC reactor was prone to excess tar build-up, which led to equipment jams and additional repair (CW2); biomass processing was flawed due to the woodchip conveyer system not being able to sufficiently feed the converter because it "kept plugging up" (CW2); the production process would frequently shutdown unexpectedly due to shortages of biomass caused by the faulty biomass conveyer system (CW2); insufficient sizing of the catalyst cooling component for the BFCC reactor (CW4); and the wood chipping unit and conveyer system did not properly supply the converter at sufficient rates (CW4). This information concerning the true status of the Columbus Facility was material because it would have been considered by a reasonable investor in the course of evaluating KiOR's operations and potential and deciding whether or not to purchase KiOR's stock.

67.    Moreover, as indicated by KiOR in its annual disclosure filing for fiscal 2012 filed with the SEC on March 18, 2013, start-up costs associated with the Columbus Facility had already reached an exorbitant $30.2 million by December 31, 2012, over 150% more than estimated by KiOR in the Company's Form 10-K filed the previous year. Further, Defendants' production target of 3 to 5 million gallons was impossible given the ongoing production delays and readily apparent design flaws plaguing the Columbus Facility as described by the former KiOR employees above. *See*, *supra*, ¶ 66. Moreover, instead of addressing and revealing these severe design flaws, Defendants attributed the lag substantially to a "blackout" that occurred in November 2012 which, according to CW2, lasted between two and six hours and presented an issue simply because the plant itself was not able to generate enough power. Additionally, as

described by CW2, a critical mass of the Columbus Facility's operations team left KiOR in February 2013, adding yet another significant obstacle in the way of achieving steady state operations.  After roughly an entire year with no production whatsoever and no resolution to the design issues in sight, Defendants' forecasts were entirely baseless and either intentionally or recklessly misleading.

*May 9, 2013*

68.  On May 9, 2013, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2013.  The press release was attached as Exhibit 99.1 to KiOR's Form 8-K filed on May 9, 2013.  Defendants continued to misleadingly tout the commercial scalability and viability of fuel production.

> "Building on the first gallons of cellulosic diesel we shipped in March, we continue to make progress with operations at our Columbus facility," said Fred Cannon, KiOR's President and Chief Executive Officer. "The on-stream percentage of our core technology in the first quarter improved approximately 500 percent over the fourth quarter. Most of our individual run times are longer than the previous runs, and we are working toward taking the facility into a steady state of operations."

> "Most significantly," Cannon continued, "**our core technology is continuing to operate as designed, and the facility is producing high quality oil and cellulosic fuel**. With these positive trends, we expect that our fuel shipments will increase and become more frequent."

69.  During an earnings conference call held that same day, May 9, 2013, the Company continued to reassure investors the Columbus Facility was "running as expected," reiterated prior guidance, and touted that vast incremental improvements in reliability were made.  Defendants continued to assert that any downtime in production were attributable to "typical issues."  Cannon stated in relevant part:

> First, let me take this opportunity to tell you what's going on at Columbus. As you

30

know, we produced and shipped the world's first commercial volume of cellulosic diesel during the first quarter. **Our core technology continues to perform at or above our expectations**. We are pleased with the progress of the start-up of the facility and it is consistent with both our experience and our guidance from last quarter. Most importantly, the facility is running. As we expected, we are beginning to see everything coming together. The operational data from last quarter bears this out. During the first quarter, the conversion unit of the Columbus facility, which contains KiOR's proprietary BFCC technology, operated for a total of 441 hours, Representing an on-stream percentage of approximately 20%. This represents an improvement of approximately 500% from the on-stream percentage during the previous quarter. Through these startups and run times, our BFCC technology has consistently performed. In general, each run at the facility is longer than the previous one. And we are seeing these longer runs without any compromise in the high quality of the oil that the facility produces. These are the types of trends that we'd like to see. We want our run times to be longer and our downtimes to be shorter. While we are pleased with this overall trend of on-stream performance, I also think that it is important to discuss our downtime during the quarter as well. If we identify something that needs to be fixed or calibrated, we do so with the utmost concern for the safety of our employees and the long-term condition of the plant.

**This means that a typical shutdown for Columbus right now in a start-up phase, meaning going in and making an adjustment that would not normally be considered very significant, can range from a few days to a couple of weeks in duration**. That time allows us to bring the full operation down safely, make our changes, fixes or adjustments, check and test our work and then take the right amount of time to carefully bring it back up again according to our start-up and operating procedures. With that background in mind, let me give you a little bit of an idea of some of the issues that have driven the downtime during last quarter.

**Approximately 70% of the downtime during the quarter has been associated with addressing typical issues in the vapor recovery unit or VRU at the facility. I call them typical because our VRU is at the back end of our conversion process. So any variability and operating conditions upstream, which happen on a frequent basis during a start-up, shows up in the form of plugging in this VRU. This is just what you would expect to see in any petrochemical or refining operation like ours.** For example, you may recall from our last call that I talked about how the power outage during the fourth quarter caused significant plugging issues that we had to clean up. This was in the VRU. **Understanding this cause-and-effect is important because issues in the VRU reflect the impact of typical variable start-up operations and minor problems elsewhere in the plant**. As a result, we must bring the facility down, fix the minor root-cause problem, claim and restart the plant. All of which takes

time. **The good news is that these issues are not indicative of a major design issue or an issue with our core BFCC technology**. At the end of the day, as we further stabilize our overall operations at the facility and move towards steady-state operations, we expect that the downtime cost in this area will decrease going forward.

**The remaining downtime, approximately 30%, was driven by a one-time mechanical issues in utilities and wood processing systems of the plant**. Once these mechanical issues were fixed, we have not seen a recurrence of these problems in subsequent startups of the facility, and we do not expect them to be an issue for the facility on a going-forward basis. It's not uncommon to encounter issues like these in a new first-of-a-kind facility. Nevertheless, we are learning a great deal. And in turn, solving problems each and every time we shutdown and restart. This will prove invaluable as we apply these lessons to future facilities. Eventually, Columbus, like every other production facility, will hit its sweet spot and get to the point where the run time is 24/7 for months on end. This is our goal, and taking the extra care now during start-up while time-consuming, is the best thing to do for our long-term operation and economics. Not to mention the safety of our employees. Every day, we are getting closer to that sweet spot as our average production run at the converter during the first quarter was just over 110 hours. Steadily increasing throughout the quarter, and a FIFO increase on a quarter-to-quarter basis. On future calls, we will continue to update you on these production metrics so that you can gauge our progress as well.

70.     Defendant Cannon reiterated the normalcy and typicality of the start-up problems impacting the Columbus Facility in the "Question-and-Answer Session" of the earnings call:

<Q – [Analyst]>: Just focused firstly on the vac -- I'm sorry, vacuum, vapor recovery units that you we're talking about. I mean, is this something that you're going to have to sort of design out by getting a different unit, a different design or is this something that you can just solve operationally in terms of the plugging issue?

<A – Fred Cannon>: No, Ed. **It's certainly not a design, the redesign needed. It's a lot of instrument failures, operating variability, in the front end of the plant, kind of normal start-up issues and they manifest themselves in the vapor recovery unit**. But we've operated it 2 weeks, ran beautifully. **So it's not a structural issue**.

71.     During the call, the Company continued to mislead investors regarding the commercial scalability and viability of its production of biofuel, specifically providing guidance

32

of "300,000 to 500,000" gallons of total fuel production for the second quarter. Defendant

Cannon stated in relevant part:

> **Consistent with our previous guidance, we expect that total fuel production during the second quarter will range between 300,000 and 500,000 gallons, keeping us on track to fall within our projected production range of 3 million to 5 million gallons for 2013**. With the gasoline pathway now approved by EPA and effective, we can produce, ship and sell both our cellulosic gasoline and diesel with a clear path to market under RFS2. Now having proven our technology, produced high-quality oil and upgraded to consistently high-quality diesel and gasoline, we are on our way to filling up more vehicles in America with cellulosic fuel made from nonfood sources and offering a significantly less environmental footprint when compared to conventional fuels. And this from a company which just came into existence in late 2007.

72.     Karnes also reaffirmed the guidance provided by Cannon during the call:

> Switching gears now to guidance. While our limited production history makes forecasting difficult, **we don't see any reason at this point to change our prior production guidance as Fred mentioned, of 3 million to 5 million gallons for the year**. Without anymore operational data, for internal purposes, **we're just assuming this production ramp occurs fairly linearly from 5,000 gallons in Q1 to between 300,000 and 500,000 gallons in Q2, as Fred mentioned**. While we expect shipments to pick up going forward, shutdowns will continue to be par for the course until the facility fully stabilizes, so shipments can be expected to be sporadic.

73.     During the call, Karnes also discussed the Columbus Facility's ongoing start-up

costs in a misleading and reckless manner:

> . . .  So apples-to-apples with the prior quarter, if you combine March product cost, net of depreciation, with a $6.6 million of start-up costs we booked to G&A for January and February, you get a comparable Q1 start up cost of $11 million which is down $1.1 million sequentially from Q4 last year. This is a significant decrease and a good trend. **As important though is the absolute decrease itself, the nature of the start-up cost clearly reflects the leveling out and stabilization of the facility as it's handed over from start-up to the operations group**. For example, outside contractor costs were down sequentially around $900,000 indicating a reduction in major operations as well as an increased reliance on KiOR's operators to handle the facility on a day-to-day basis. We would expect this trend to continue while Columbus stabilizes and these costs ultimately wind down as we progress to steady-state operations in the months

33

ahead. . . .

. . .

And then the wildcard is, what about the start-up costs, are there anymore special operations that need to be done, anymore repairs, how much overtime, what of kind of equipment rentals? To be safe, like I said, we put $4 million to $5 million for the quarter. That could be a conservative and that certainly should come down. But those are really the 4 components, as you think about it. And then those just reside over the production to get into your unit cost and that's the only way we can look at it right now until we get more production experience.

74.      The above bold-faced statements in ¶¶ 68, 69, 70, 71, 72, and 73 were false and misleading because (i) the statements materially misled investors to believe that the Columbus Facility's "start-up phase" was progressing as designed and intended and/or (ii) the statements omitted material information concerning the then-existing atypical, significant design and mechanical flaws affecting operations at the Columbus Facility.  Specifically, as recalled by former employees at the Columbus Facility and confirmed by Defendants in KiOR's 2013Y Form 10-K, the Columbus Facility had been experiencing the following problems during the "start-up phase" prior to the making of the above statements: specific design issues existed within the Columbus Facility, including the Vapor Recovery Unit affecting the overall yield and efficiency aspects of production (CW1); certain equipment within the Columbus Facility was undersized and could not handle wastewater byproduct generated by the BFCC reaction process (CW2); the BFCC reactor was prone to excess tar build-up, which led to equipment jams and additional repair (CW2); biomass processing was flawed due to the woodchip conveyer system not being able to sufficiently feed the converter because it "kept plugging up" (CW2); the production process would frequently shutdown unexpectedly due to shortages of biomass caused by the faulty biomass conveyer system (CW2); insufficient sizing of the catalyst cooling

34

component for the BFCC reactor (CW4); and the wood chipping unit and conveyer system did not properly supply the converter at sufficient rates (CW4).  Furthermore, additional former employees at the Columbus Facility recall the same issues existing shortly after Defendants made the above statements.  In particular, the Columbus Facility was shutdown for the majority of July and August 2013 (CW3); the BFCC reactor was still producing excess amounts of tar-like substances which jammed various components of the production line and resulted in failures and additional maintenance (CW3); the conveyor system for the biomass processing was continually jamming and resulting in severe delays (CW3); the wood chipping system and conveyer system repeated failed and required numerous, extensive repairs (CW5).  This information concerning the true status of the Columbus Facility was material because it would have been considered by a reasonable investor in the course of evaluating KiOR's operations and potential and deciding whether or not to purchase KiOR's stock.

75.  Moreover, Defendant Karnes' affirmance of the guidance of between "3 million to 5 million gallons for the year" and "300,000 and 500,000 gallons in Q2" (identified in bold-face in ¶ 72) was especially misleading and/or deliberately reckless.  Given (i) the severe start-up problems being encountered by the operations staff (*supra*, ¶ 74), (ii) the fact that the Columbus Facility had only produced a mere 5,000 gallons since inception (*supra*, ¶ 72), and (iii) Defendants' stated expectation that that "shutdowns [would] continue to be par for the course until the facility fully stabilizes" (*supra*, ¶ 72), Karnes' guidance of 3-5 million gallons of production for the remainder of the year was recklessly misleading.  Karnes' guidance of 300,000 to 500,000 gallons of production for the remainder of the second quarter (which comprised the approximate 50 days between May 9, 2013 (the date of the earnings call) and June

30, 2013 (the end of the second quarter), was even more reckless; to be sure, Defendants would have had to produce 6,000 gallons per day every day for a period of 50 days just to meet the lower bound of the estimate, which would have represented an on-stream run-time significantly greater than any previous accomplishment in the Columbus Facility's history.

76.     Similarly, Defendant Karnes' assurance and representation that the $1.1 million decline in start-up costs "clearly reflect[ed] the leveling out and stabilization of the [Columbus Facility]" was wildly misleading and reckless with regard to accuracy.  Beginning with KiOR's first publicly filed quarterly disclosure (Form 10-Q) for the second quarter of fiscal 2011, Defendants estimated that the entire start-up costs for the Columbus Facility would be $20 million.  By the time Karnes made the above statement on May 9, 2013, start-up costs for the Columbus Facility had already exceeded $41 million, more than twice the initial estimate. Moreover, aside from the $1.1 million decline between 4Q12 and 1Q13, start-up costs had increased quarter-over-quarter since inception: start-up costs for 1Q12 were $1.9 million; $6 million for 2Q12; $10.2 million for 3Q12; and $12.1 million for 4Q12.  This increasing trend of start-up costs is due to the ongoing significant design and mechanical flaws at the Columbus Facility (as discussed above, *supra*, ¶ 74).  In light of this trend and the ongoing design and mechanical flaws, Karnes' assurance as to the "leveling out and stabilization" of the Columbus Facility was recklessly misleading.

*May 29, 2013*

77.     During the May 29, 2013 Cowen Technology, Media & Telecommunications Conference, Karnes' investor presentation continued to reassure investors that the issues the Company has seen at the Columbus Facility were minor and did not implicate the propriety of

the Company's technology.

> That's a good question. The question is our Columbus plant now, we've been in the start-up mode for around three quarters. We initially estimated that the plant would come up a little bit quicker than that. **And then what we've seen is, the good news is, all the complications that we've incurred have been minor. None of them have implicated any of KiOR's technology**. And the fact that the oil we've made has always been the highest quality oil that we made at any point in the process, pilot, demonstration, what have you . . . .

78.    The above bold-faced statement in ¶ 77 was false and misleading because (i) the statement materially misled investors to believe that the Columbus Facility's "start-up phase" was progressing as designed and intended and/or (ii) the statement omitted material information concerning the then-existing atypical, significant design and mechanical flaws affecting operations at the Columbus Facility.  Specifically, as recalled by former employees at the Columbus Facility and confirmed by Defendants in KiOR's 2013 10-K, the Columbus Facility had been experiencing the following problems during the "start-up phase" prior to the making of the above statements: specific design issues existed within the Columbus Facility, including the Vapor Recovery Unit affecting the overall yield and efficiency aspects of production (CW1); certain equipment within the Columbus Facility was undersized and could not handle wastewater byproduct generated by the BFCC reaction process (CW2); the BFCC reactor was prone to excess tar build-up, which led to equipment jams and additional repair (CW2); biomass processing was flawed due to the woodchip conveyer system not being able to sufficiently feed the converter because it "kept plugging up" (CW2); the production process would frequently shutdown unexpectedly due to shortages of biomass caused by the faulty biomass conveyer system (CW2); insufficient sizing of the catalyst cooling component for the BFCC reactor (CW4); and the wood chipping unit and conveyer system did not properly supply the converter at

sufficient rates (CW4).  Furthermore, additional former employees at the Columbus Facility recall the same issues existing shortly after Defendants made the above statements.  In particular, the Columbus Facility was shutdown for the majority of July and August 2013 (CW3); the BFCC reactor was still producing excess amounts of tar-like substances which jammed various components of the production line and resulted in failures and additional maintenance (CW3); the conveyor system for the biomass processing was continually jamming and resulting in severe delays (CW3); the wood chipping system and conveyer system repeated failed and required numerous, extensive repairs (CW5).  This information concerning the true status of the Columbus Facility was material because it would have been considered by a reasonable investor in the course of evaluating KiOR's operations and potential and deciding whether or not to purchase KiOR's stock.

## THE TRUTH EMERGES THROUGH PARTIAL DISCLOSURES WHILE DEFENDANTS CONTINUE TO ISSUE FALSE ASSURANCES

*July 1, 2013*

79.    On July 1, 2013, the Company issued a press release providing an update on production at the Columbus Facility.  The press release was attached as Exhibit 99.1 to KiOR's Form 8-K filed on July 1, 2013.  The announcement revealed that the Company had made its "first fuel shipment since March, 2013" on June 28, 2013.  Notwithstanding the fact that KiOR had not shipped any fuel since its first-ever shipment of fuel from the Columbus Facility back in March 2013, the press release did not address the fact that it had failed to meet its 2Q13 production estimate of 300,000 to 500,000 gallons of fuel or take any steps to revise its year-end production estimate of 3 to 5 million gallons.

80.    This adverse news caused the Company's stock price to fall on July 1, 2013 from

$5.71/share to $5.42/share or 5.08% on unusually heavy volume.  KiOR stock price continued to fall on July 2, 2013 and closed at $4.80/share on July 2, 2013 on unusually heavy volume, a 16% decline from its June 28, 2013 closing price.

81.    Despite disclosure of this troubling update, the July 1, 2013 press release continued to contain false and misleading representations and omissions offering investors false hope that the Company would meet its targets.  The press release stated in pertinent part:

> "Commencing regular shipments of gasoline and diesel is very significant for KiOR, as it reflects the continuous improvements in our operations at the Columbus facility," said Fred Cannon, KiOR's President and CEO. "We have been undertaking considerable reliability and optimization efforts in areas of the facility unrelated to KiOR's core technology. **The success of these efforts gives us confidence, more than ever, that the performance targets for the Columbus plant are attainable in the months ahead** and that our operating assumptions for our next, larger Natchez plant are reasonable."

> "**With the facility operating stably and producing cellulosic gasoline and diesel at commercial scale**, we believe we are on track to achieve steady-state operations before the end of the calendar year and to demonstrate improving performance metrics over that timeframe," Cannon continued. "The largest commercially producing cellulosic production facility in the world, we expect Columbus – enhanced with our recent optimizations — to be the basis of our second facility's design at Natchez."

82.    The above bold-face statements in ¶ 81 were false and misleading because (i) the statement materially misled investors to believe that the Columbus Facility's "start-up phase" was progressing as designed and intended and/or (ii) the statement omitted material information concerning the then-existing atypical, significant design and mechanical flaws affecting operations at the Columbus Facility.  Specifically, as recalled by former employees at the Columbus Facility and confirmed by Defendants in KiOR's 2013Y Form 10-K, the Columbus Facility had been experiencing the following problems during the "start-up phase" prior to the making of the above statements: specific design issues existed within the Columbus Facility,

including the Vapor Recovery Unit affecting the overall yield and efficiency aspects of production (CW1); certain equipment within the Columbus Facility was undersized and could not handle wastewater byproduct generated by the BFCC reaction process (CW2); the BFCC reactor was prone to excess tar build-up, which led to equipment jams and additional repair (CW2); biomass processing was flawed due to the woodchip conveyer system not being able to sufficiently feed the converter because it "kept plugging up" (CW2); the production process would frequently shutdown unexpectedly due to shortages of biomass caused by the faulty biomass conveyer system (CW2); insufficient sizing of the catalyst cooling component for the BFCC reactor (CW4); and the wood chipping unit and conveyer system did not properly supply the converter at sufficient rates (CW4).  Furthermore, additional former employees at the Columbus Facility recall the same issues existing shortly after Defendants made the above statements.  In particular, the Columbus Facility was shutdown for the majority of July and August 2013 (CW3); the BFCC reactor was still producing excess amounts of tar-like substances which jammed various components of the production line and resulted in failures and additional maintenance (CW3); the conveyor system for the biomass processing was continually jamming and resulting in severe delays (CW3); the wood chipping system and conveyer system repeated failed and required numerous, extensive repairs (CW5).  This information concerning the true status of the Columbus Facility was material because it would have been considered by a reasonable investor in the course of evaluating KiOR's operations and potential and deciding whether or not to purchase KiOR's stock.

83.    Moreover, specifically with regard to the expressed "confidence" over the "performance targets," Defendant Cannon's statement was misleading and/or reckless with

regard to accuracy.  Prior to the July 1, 2013 press release, Defendants had represented that the Columbus Facility produced 5,000 gallons in March 2013.  On July 1, 2013, rather than revise the previous estimate of 3 to 5 million gallons for the year, Defendants falsely reassured investors that the Columbus Facility was operating on track to meet unrealistic targets given the design and production problems materially impacting the factory's operations, as reported by KiOR's former employees above.  *See*, *supra*, ¶ 82.  In fact, as Defendants would later reveal, the Columbus Facility only produced 185,134 gallons during 2013 prior to July 1, 2013.  *See* KiOR Press Release, September 19, 2013.  <u>Accordingly, for Defendants to meet their production estimate, the Columbus Facility would have had to produce an astonishing 15,638 gallons of fuel every day for the remaining six months of the year just to meet the lower bound of their 3 to 5 million gallon estimate</u>.  In light of the Company's then-existing production capabilities and the fact that the Columbus Facility had yet to run for a period of longer than 30 consecutive days, Cannon's "confident" reassurance of the 3 to 5 million production estimate was misleading and/or reckless with regard to accuracy.

*August 8, 2013*

84.    KiOR issued another press release on August 8, 2013.  The press release was attached as Exhibit 99.1 to the Company's Form 8-K filed on August 8, 2013.  The press release reiterated that KiOR, in total, had shipped 75,000 gallons of cellulosic fuel from the Columbus Facility.  The Company stated in a press release the following:

> "In total," Cannon continued, "we shipped over 75,000 gallons of cellulosic fuel from Columbus. The BFCC unit is running now and producing high quality oil that we are preparing to upgrade into fuel and ship to our customers. Over the next few months, we will focus on further building that progress and we look to

push the facility closer to its nameplate capacity."

85.     Defendants also hosted an earnings conference call on August 8, 2013.  During the call, Cannon revised the previously provided 3 to 5 million annual gallon production estimate:

> Ramping up with what the rest of 2013 looks like. I can tell you that we intend to push closer to nameplate capacity, and we expect to drive operating conditions to greater efficiencies. Given our operational priorities, we are not intending to run the plant towards specific volume targets during 2013. As such, we expect our full year production levels will be in the 1 million to 2 million gallon range. I then believe that we will be in a good position to increase our yields consistent with our expectations.

86.     This adverse news caused the Company's stock price to fall from $4.76/share on August 7, 2013 to $4.29/share on August 8, 2013, or 9.87% on heavy volume.  KiOR's stock price continued to fall over the course of the next several days while the recent news concerning KiOR's operations infiltrated the market.   On August 15, 2013, KiOR's stock closed at $2.62/share, a drop of 45% on unusually heavy volume.

87.     During the earnings call, Defendants also materially mislead and/or recklessly misrepresented investors as to operations at the Columbus Facility.   Significantly, Cannon addressed the progress of the Columbus Facility and, for the first time, introduced the three "phases" of the Columbus Facility's production process that would later be cited as the underlying cause for its shutdown:

> Today, I'd like to talk to you about how we are progressing at Columbus. There are 3 phases that we would view as necessary to go through to bring a first-of-kind facility like this to a first -- to a steady state. First, is the reliability phase, which concentrates on simply running the facility and building on-stream percentage. After that, comes the throughput phase, in which we will build throughput of the facility toward nameplate capacity while maintaining on-stream percentage. The last is optimization phase, during which we will work to increase the process efficiency of the facility which, for us, is reflected in yield. We are

still continuing our start-up path at Columbus and lining out the facility, but we have made significant progress on the first phase and are getting greater on-stream reliability. And we are beginning to work on the second phase by increasing throughput to nameplate capacity. I'm going to give you some color on those and I hope that you will see why we are growing more confident every day about this facility.

. . .

So let me first talk about the BFCC and give you some specifics on what we saw on our run times during the quarter. In all, the BFCC operated for a total of just under 40 days in the second quarter, representing another significant improvement over the previous quarter, more than doubling our quarterly on-stream percentage from 23 -- from 20% to 43%. Our first run was April 22 to April 27. We then started the BFCC backup on May 6 and ran it until May 12. We decided to terminate both of these runs due to feed synchronization issues. **Nothing about the KiOR technology prevented the runs from going longer**.

. . .

The operation was terminated when we needed to make a repair in the Wood Yard, and that was just to replace some bearings. **To reiterate, nothing about the KiOR technology prevented this run from going even longer**. These are the types of start-up issues we're experiencing. And while they can be certainty be frustrating, they're all relatively small in nature. As has been the case since we first started the facility, **these issues are not related to our core technology. They are simply part of the break-in process**.

. . .

We're gaining a tremendous amount of operating experience at Columbus. **We are now able to operate the plant through issues that would have previously resulted in a shutdown of the plant, and we continue to prove that our proprietary technology works consistent with or better than our expectations**. For the remainder of the third quarter, we want to build on our progress and increased rates, really stretch the plant's legs, so to speak. We will look to ramp up the throughput while still maintaining a high level of reliability.

88.    Defendant Karnes falsely reaffirmed Cannon's assurances as to the efficacy of the

Columbus Facility's operations:

Well, we can't really get into a lot of details about our financing activities right now, but I can -- separate apart from the financing, we can tell you that we do

43

view the shipment of fuel in Q2 as a very significant milestone, even though it was only 75,000 gallons. **Again, the issues that the Columbus plant has been working through are not at all related to our technology**. So the plant, I think, has proven, it's fair to say, that it can produce at commercial scale.

89.     The above bold-face statements in ¶¶ 87 and 88 were false and misleading because (i) the statement materially misled investors to believe that the Columbus Facility's "start-up phase" was progressing as designed and intended and/or (ii) the statement omitted material information concerning the then-existing atypical, significant design and mechanical flaws affecting operations at the Columbus Facility.  Specifically, as recalled by former employees at the Columbus Facility and confirmed by Defendants in KiOR's 2013 10-K, the Columbus Facility had been experiencing the following problems during the "start-up phase" prior to the making of the above statements: specific design issues existed within the Columbus Facility, including the Vapor Recovery Unit affecting the overall yield and efficiency aspects of production (CW1); certain equipment within the Columbus Facility was undersized and could not handle wastewater byproduct generated by the BFCC reaction process (CW2); the BFCC reactor was prone to excess tar build-up, which led to equipment jams and additional repair (CW2); biomass processing was flawed due to the woodchip conveyer system not being able to sufficiently feed the converter because it "kept plugging up" (CW2); the production process would frequently shutdown unexpectedly due to shortages of biomass caused by the faulty biomass conveyer system (CW2); insufficient sizing of the catalyst cooling component for the BFCC reactor (CW4); and the wood chipping unit and conveyer system did not properly supply the converter at sufficient rates (CW4).  Furthermore, additional former employees at the Columbus Facility recall the same issues existing shortly before and after Defendants made the above statements.  In particular, the Columbus Facility was shutdown for the majority of July

44

and August 2013 (CW3); the BFCC reactor was still producing excess amounts of tar-like substances which jammed various components of the production line and resulted in failures and additional maintenance (CW3); the conveyor system for the biomass processing was continually jamming and resulting in severe delays (CW3); the wood chipping system and conveyer system repeated failed and required numerous, extensive repairs (CW5).  This information concerning the true status of the Columbus Facility was material because it would have been considered by a reasonable investor in the course of evaluating KiOR's operations and potential and deciding whether or not to purchase KiOR's stock.

*September 19, 2013*

90.     KiOR issued a press release on September 19, 2013.  The press release was attached as Exhibit 99.1 to the Company's Form 8-K filed on September 19, 2013.  Defendant Cannon, in the press release, falsely reassured investors of the Columbus Facility's operations and ability to meet Defendants' production estimates:

> In July and August, the Columbus facility produced 172,398 gallons of fuel, bringing the 2013 production total from the facility to 357,532 gallons through August 31, 2013. The ratio between gasoline, diesel and fuel oil produced during the most recent two months equaled to approximately 83% gasoline and diesel, with the remaining production as fuel oil. Production from Columbus during July and August exceeded total second quarter production by nearly 40,000 gallons.

> As of August 31, 2013, Columbus has shipped 199,071 gallons of fuel since the beginning of 2013, about half of which (99,175 gallons) were shipped in July and August. The Company expects to continue shipping fuel produced in July and August during the month of September.

> "KiOR's Columbus facility continues to make strides toward steady state operations," said Fred Cannon, President and CEO. "**With the BFCC section of the Columbus facility currently producing additional oil, we believe that we are well-positioned to build on the progress made during July and August and to produce additional volumes of cellulosic fuel for American vehicles consistent with our most recent guidance**."

45

91.     Rather than further revise the recent downgraded estimate of 1 to 2 million gallons for the year, Defendants falsely reassured investors that the Columbus Facility was operating on track to meet unrealistic targets given the design and production problems materially impacting the factory's operations, as reported by KiOR's former employees above. *See*, *supra*, ¶ 89.  Given the Columbus Facility's past production of 357,532 gallons, Defendants needed to produce an additional 642,468 gallons to meet the lower bound of their 1 to 2 million gallon production estimate.  In other words, Defendants needed to produce approximately 5,353 gallons per day every day from September through December 2013.  In light of the Company's then-existing production capabilities and the fact that the Columbus Facility had yet to run for a period of longer than 30 consecutive days, Cannon's affirmation of the standing production estimate was misleading and/or reckless with regard to accuracy.

*November 7, 2013*

92.     On November 7, 2013, KiOR issued a press release which again touted the Columbus Facility's progress towards stable operations, as well as the Company's ability to meet its previously issued production forecast.  The press release was attached as Exhibit 99.1 to the Company's Form 8-K filed on November 7, 2013.  It stated in pertinent part:

> "I am happy to report again that we are seeing significant operational progress at our Columbus facility and **we believe that we are turning the corner toward steady state operations**," said Fred Cannon, KiOR's President and Chief Executive Officer. "We produced 323,841 gallons of fuel in the quarter, which brought us to a total production of 508,975 gallons of cellulosic fuel through the end of the third quarter."

> "Just as importantly," Cannon continued, "Columbus is on a run which began in mid-September, and we are continuing to ramp up throughput at the facility. Our fourth quarter has gotten off to a good start and we saw total production in October of 167,087 gallons of fuel, our highest month to date. **As a result, we believe that with stable production over the balance of the year, our full year**

46

**production levels will exceed 1 million gallons**. These achievements support our strategy to pursue Columbus II as the company's next project and the $100 million in financing commitments we received are serving as the cornerstone investments for that facility."

93.     Defendants held an earnings conference call the same day they issued the press release on November 7, 2013.  Defendant Cannon again misrepresented the progress of the Columbus Facility by assuring investors that it was "turning the corner" and "transitioning to commercial success."  Cannon falsely stated:

**As you know, we kept the BFCC down during July, so we can make some repairs and improvements in the Wood Yard**. Our activity in July was focused on finished product production and shipments, and I'll give you those figures in a minute. When we brought the BFCC back online in August, it had the second-longest run, operating for 19 days starting on August 5. **We encountered some issues in the Wood Yard again. Nothing had to do with our BFCC or proprietary technology, and brought the BFCC down to address these Wood Yard issues on August 24**. We returned the BFCC to service on September 12, and it is still running today. Just considering the third quarter alone, that second campaign represented an additional 19-day run and resulted in our ability to achieve an on-stream performance of 41% for the third quarter.

. . .

Our team has come together and the plan is continuing to line out toward routine operations, which will allow us to focus on throughput and optimization going forward. In contrast to our earlier start-up efforts which were more reactive and focused on just keeping the plant running, our operations now are much more proactive and the plant generally goes down only on a planned basis as opposed to unplanned basis as before. We are obviously not yet lined out at nameplate capacity, **but we believe that uncertainty and up-and-down operations that marked the start-up period are now largely behind us**.

. . .

Shipments may lag production at the end of the year, but we'll do our best to ship everything we produce in December. Obviously, we plan to deliver anything not out the door this year in January. **We believe that the transition to steady state is increasingly behind us and we are now transitioning to a true operating company**. We are focusing on optimization and expect to be turning our attention to rates and yields in the months ahead.

47

94.    Defendants continued to provide misleading information and omit other material information regarding the Columbus Facility's true operational status in the "Question-and-Answer Session" portion of the earnings call:

> \<Q – [Analyst]\>: And with the issues in the Wood Yard, now it looks like they're in the rearview, hopefully. And what are the other pieces of equipment that your operations guys have been focused on the most?
>
> \<A – Fred Cannon\>: **Yes, actually, it's been mostly the Wood Yard. Our last couple of outages were certainly a result of the Wood Yard. We've taken it down, made some improvements there in design and operational improvements and control. So we're -- and we're still working there. So I would say in our last quarter and so far, this quarter, of course, so far this quarter, we've done very, very well. But that would be more related to the Wood Yard. The converter has run very [indiscernible]**

95.    Presciently, one analysts questioned Cannon and Karnes on the ability of the Columbus Facility effectively "turn the corner" and exit from the "start-up phase":

> \<Q – [Analyst]\>: So, you said, I think, earlier, Fred, sort of end 2014 is the sort of the finalization of the round-out of the Columbus I. I mean, obviously, that's kind of like 18 months to 2 years, which is probably a bit longer than what you're saying when you were first starting up the units. And that makes it sound a little bit more like design rather than just start-up rounding out. So I mean, I'd just like some point of clarification, agree, disagree on what I've just said, and maybe what the issues are you're still facing to get up to full runs?
>
> \<A – Fred Cannon\>: **Yes, and maybe there's some under -- I appreciate you're asking that question, Ed. The plant we're feeding at 50%, 60%, maybe even more on a consistent basis now. And what we'll be doing is, of course, getting that up to 100% of feed right to the unit. At the same time, we'll be going through our optimization to get the yields up. And it's a process we're still working through. Some -- I wouldn't say that the BFCC has run very well, so we're still working through to get our Wood Yard up to that level, so we can consistently feed it. I guess the question, maybe I didn't understand it earlier, but Thad [ph] will be working over the next few months to accomplish that.**

96.    The above bold-face statements in ¶¶ 92, 93, 94, and 95 were false and misleading because (i) the statement materially misled investors to believe that the Columbus Facility's

"start-up phase" was progressing as designed and intended and/or (ii) the statement omitted material information concerning the then-existing atypical, significant design and mechanical flaws affecting operations at the Columbus Facility.  Specifically, as recalled by former employees at the Columbus Facility and confirmed by Defendants in KiOR's 2013 10-K, the Columbus Facility had been experiencing the following problems during the "start-up phase" prior to the making of the above statements: specific design issues existed within the Columbus Facility, including the Vapor Recovery Unit affecting the overall yield and efficiency aspects of production (CW1); certain equipment within the Columbus Facility was undersized and could not handle wastewater byproduct generated by the BFCC reaction process (CW2); the BFCC reactor was prone to excess tar build-up, which led to equipment jams and additional repair (CW2); biomass processing was flawed due to the woodchip conveyer system not being able to sufficiently feed the converter because it "kept plugging up" (CW2); the production process would frequently shutdown unexpectedly due to shortages of biomass caused by the faulty biomass conveyer system (CW2); insufficient sizing of the catalyst cooling component for the BFCC reactor (CW4); and the wood chipping unit and conveyer system did not properly supply the converter at sufficient rates (CW4).  Furthermore, additional former employees at the Columbus Facility recall the same issues existing shortly before Defendants made the above statements.  In particular, the Columbus Facility was shutdown for the majority of July and August 2013 (CW3); the BFCC reactor was still producing excess amounts of tar-like substances which jammed various components of the production line and resulted in failures and additional maintenance (CW3); the conveyor system for the biomass processing was continually jamming and resulting in severe delays (CW3); the wood chipping system and conveyer system repeated

49

failed and required numerous, extensive repairs (CW5).  This information concerning the true status of the Columbus Facility was material because it would have been considered by a reasonable investor in the course of evaluating KiOR's operations and potential and deciding whether or not to purchase KiOR's stock.

97.     Moreover, specifically with regard to Cannon's affirmation of the Columbus Facility's ability to meet Defendants' 1 million gallon production estimate, Defendant Cannon's statement was misleading and/or reckless with regard to accuracy.  As of November 1, 2013, the Columbus Facility had produced 676,062 gallons of fuel with its longest on-stream run-time ever of 57 days.  For the Columbus Facility to meet the 1 million gallon estimate, it would need to produce an additional 323,938 gallons over the course of the remaining two months of the year; in other words, 5,400 gallons per day every day for a period of time roughly equal to its then-existing longest on-stream run-time ever.  In light of the Company's then-existing production capabilities (*supra*, ¶ 96), Cannon's "confident" reassurance of the 3 to 5 million production estimate was misleading and/or reckless with regard to accuracy.

*December 4, 2013*

98.     On December 4, 2013, KiOR filed a Form 8-K with the SEC announcing that Karnes resigned from the Company.  The Form 8-K stated in pertinent part as follows: "On December 1, 2013, John H. Karnes notified KiOR, Inc. (the 'Company'), of his intent to resign as Chief Financial Officer and principal financial officer the Company.  Mr. Karnes' resignation was effective December 3, 2013."

99.     The Company has failed to issue any statement explaining why or under what

50

circumstances Karnes resigned.  However, the facts show that Karnes routinely provided materially false, misleading, and reckless guidance regarding the Columbus Facility's production capabilities during investor earning calls.  Karnes' abrupt resignation from his position as KiOR's CFO, with no explanation or statement from either Karnes or the Company, gives rise to the inference that Karnes either resigned because of a disagreement with KiOR's executive management regarding the Company's operations and reporting or was forced to resign because KiOR's executive management disagreed with Karnes' work at the Company.

100.   This announcement caused the Company stock to fall from $2.06/share on December 3, 2013 to $1.89/share, or 8.25%, on December 4, 2013, on heavier than normal volume.

*December 23, 2013*

101.   KiOR issued a press release on December 23, 2013.  A copy of the press release was attached as an exhibit to the Company's Form 8-K filed December 23, 2013.  The press release indicated that the Company "expect[ed] that, given current and anticipated operations through the remainder of the year, the Columbus facility will produce approximately 410,000 gallons of fuel during the fourth quarter of 2013, bringing full year production total from the facility to approximately 920,000 gallons."  The Columbus Facility's total productions and shipments for 2013 would actually be 894,000 gallons and 597,000, respectively, as confirmed by Defendants in a subsequent January 9, 2014 conference call (described below).

102.   Despite Defendants' assurances as to the commercial viability of the Columbus Facility and its ability to meet and exceed production forecasts, the press release also revealed that the Columbus Facility would be ceasing commercial production through the end of 1Q14 for

"mechanical improvements":

> "Despite our accomplishments to date, **we still have a lot of work to do to bring the Columbus facility towards target throughput, yield and financial performance levels**. The financial performance of the facility was also negatively impacted by the temporarily depressed pricing for RINs caused by proposed 2014 renewable volume obligation rulemaking by the USEPA."
>
> "Given these factors," Mr. Cannon continued, "we believe that, from both an operational and financial perspective, we need to focus our execution on three simple goals: first, bringing the Columbus facility to the levels of operational and financial performance that we expected when we designed that facility over three years ago; second, continuing to develop our technology so that we can improve our yields and process improvements both at Columbus and at future facilities; and third, aggressively managing our cost without sacrificing our long term goals. **To that end, from now through the end of the first quarter of 2014, we expect that our efforts at Columbus will be focused on implementing a series of mechanical improvements to the facility rather than production volumes**. We plan to operate the facility on a limited campaign basis only to verify the expected impact of improvements we intend to implement. In addition, we continue to see encouraging developments in our catalyst and process development efforts that we believe will continue to drive improvement in yields and overall plant economics.

103.    On this news, KiOR stock declined an additional 4.37% from $1.60/share on December 23, 2013, to close at $1.53/share on December 24, 2014, on higher than average volume.

*January 9, 2014*

104.    On January 9, 2014, KiOR held a conference call to discuss its decision to shut down the Columbus Facility.  During the call, the Company and Cannon revealed to investors that the proposed "mechanical improvements" required and would cost an additional $10 million to complete. KiOR also stated that it would need to spend an additional $22 million in research in development to achieve the kind of yields that could make it a sustainable business.  During the conference call, Cannon stated in relevant part:

This project is designed to address the three key drivers of Columbus' performance: **throughput, yield and overall process efficiency and reliability**. Let me walk through what we intend to do regarding each of these three drivers in greater detail. **On throughput, we have identified several improvements that will implement some changes to the BFCC hydrotreater and wood yard that we believe will eliminate structural design bottlenecks and reliability issues that limit the amount of wood that we can introduce to our BFCC system**.

For example, we are planning to place additional equipment in the wood yard that will allow us to recover biomass currently lost in the processing of the wood chips and process more wood chips. We expect that many of these improvements will be implemented during the first three quarters of 2014, with the majority of them in the first quarter of 2014.

Assuming that we can implement these improvements on the timetable we have planned and that they work as planned, we believe that these improvements will allow Columbus plant to process at or near nameplate capacity for biomass, 500 bone dry tons per day by the end of 2014.

**On yield, we have identified additional enhancements that we believe will improve the overall yield of transportation fuels from each ton of biomass from the Columbus facility**. For example, we expect to obtain commercial supply of our next-generation catalyst, which we had previously expected to receive in the fourth quarter of 2013 during the second quarter of 2014.

In addition, we plan to install additional equipment that we believe will give us the ability to recover yield both from our process gases and process water. Again, assuming that we can implement these projects on the timetable we have planned and they work as planned, we would expect that our yield in Columbus will increase significantly by the first quarter of 2015.

**On process efficiency and reliability, we have identified another series of improvements that we believe will further optimize our processes and increase reliability and on-stream percentage through the facility**. Some of these projects include an installation of additional tankage to increase operational flexibility and efficiency, and modifications to the hydrotreating unit which will decrease the volumes of fuel oil and off-spec product, while others will be aimed at reducing our cost structure by, among other things, decreasing natural gas consumption by the facility.

105.    Contrary to past earnings calls and representations made therein, Cannon and the

Company refused to provide specific guidance with respect to "yield and process efficiency and

53

on-stream percentage." Christopher A. Artzer ("Artzer"), KiOR's Vice President, General

Counsel, and Interim CFO, explained as follows in response to an analyst question:

> <Q – [Analyst]>: Yeah. Guys, thanks very much for taking the question. With
> regard to your plans for the second half of the year, I realize you're not giving
> guidance formally, but would you anticipate reaching nameplate capacity at
> Columbus perhaps by the end of 2014?
> . . .
> <A – Christopher A. Artzer>: From a perspective of throughput, as we've
> outlined, we do expect to be able to increase our throughput rate consistent with
> what Fred outlined in his remarks, which is getting to at or near our nameplate
> capacity of throughput of 500 tons per day by the end of 2014.
>
> In terms of yield and process efficiency and on-stream percentage, because the
> projects that we have are largely interrelated, we believe that it's prudent at this
> point not to provide specific guidance with regard to what those results might be,
> although we do expect to see a significant improvement over the levels that we
> achieved in 2013.

106. KiOR previously and routinely provided investors with guidance relating to the

Columbus Facility's productivity. Given that the Columbus Facility had not undergone

"mechanical improvements" since the last time such guidance was provided, the Company's

refusal to give such guidance on the January 9, 2014 conference call evidences that past forecasts

were materially false and misleading because they were not reasonably based on sufficient facts.

107. This adverse news caused the Company's stock to decline from $1.75/share to

$1.65/share or 5.7% on January 9, 2014, on above average volume.

108. The next day, KiOR was then downgraded by analyst firm Raymond James &

Associates, citing production concerns, causing the Company's stock to decline from $1.65/share

to $1.49/share or 9.6% over the next trading days on higher than average volume.

109. On January 14, 2014, KiOR was also downgraded by analyst firm Cowen and

Company, who cited production concerns. This adverse news caused the Company caused the

Company's stock to fall from $1.49/share to $1.36/share or 8.7% on heavy volume.

110.    The above bold-face statements in ¶ 104 were false and misleading because (i) the statement materially misled investors to believe that the Columbus Facility's "start-up" problems were capable of being fixed without substantive redesigning critical aspects of the production process and/or (ii) the statements omitted material information concerning the extent of the throughput, yield, and reliability problems and the scope of the necessary redesign work necessary for successful operations at the Columbus Facility.  Specifically, the above statements failed to accurately inform investors of the impact and scope of the throughput, yield, and reliability issues.  For instance, the above statements did not inform investors that the "structural design bottlenecks and reliability issues" caused the Columbus Facility to run significantly below nameplate capacity, as would be revealed by Defendants later in KiOR's 2013 10-K.  Additionally, the above statements did not inform investors that the Columbus Facility's yield had been materially negatively affected by the continued use of an outdated catalyst and mechanical failures disrupting the BFCC reactor, information that would also be subsequently revealed in the 2013Y Form 10-K.  Furthermore, the above statements did not accurately disclose that its core BFCC hydrotreater had been prone to repeated shutdowns resulting in off-specification product.  Finally, and most significant, the above statements did not inform investors that these issues, which were once characterized as "typical" start-up glitches, were in fact substantive design and mechanical flaws.  This information concerning the true status of the Columbus Facility was material because it would have been considered by a reasonable investor in the course of evaluating KiOR's operations and potential and deciding whether or not to purchase KiOR's stock.

*March 17, 2014*

111.    Cannon and the Company filed KiOR's 2013 10-K after the market closed on March 17, 2014. The 2013 10-K discussed the Columbus Facility at length and, for the first time ever, confirmed that its operations had been severely impeded by not just typical start-up glitches, but significant structural design problems.

112.    Beginning on page 3 and continuing to page 4 of the 2013 10-K, the Company explained that it would be shutting down the Columbus Facility in its entirety in order to return to the proverbial drawing board:

> Until recently, we have focused our efforts on research and development and the construction and operation of our initial-scale commercial production facility in Columbus, Mississippi, or our Columbus facility. We did not reach "steady state" operations at our Columbus facility nor were we able to achieve the throughput and yield targets for the facility because of **structural bottlenecks, reliability and mechanical issues, and catalyst performance**. In January 2014, we elected to temporarily discontinue operations at our Columbus facility in order to attempt to complete a series of optimization projects and upgrades that are intended to help achieve operational targets that we believe are attainable based on the design of the facility. While we have completed some of these projects and upgrades, **we have elected to suspend further optimization work and bring the Columbus facility to a safe, idle state, which we believe will enable us to restart the facility upon the achievement of additional research and development milestones, consisting of process improvements and catalyst design, financing and completion of the optimization work**. Unless and until we restart the Columbus facility, we expect to have no production or revenue from that facility.
>
> . . .
>
> During the first quarter of 2014, we commenced a series of optimization projects and upgrades at our Columbus facility. The optimization projects and upgrades are targeted at improving throughput, yield and overall process efficiency and reliability. **In terms of throughput, we have experienced issues with structural design bottlenecks and reliability that have limited the amount of wood that we can introduce to our BFCC system**. These issues have caused the Columbus facility to run significantly below its nameplate capacity for biomass of 500 bone dry tons per day and limited our ability to produce cellulosic

56

gasoline and diesel. We have identified and intend to implement changes to the BFCC, hydrotreater and wood yard that we believe will alleviate these issues. **In terms of yield, we have identified additional enhancements that we believe will improve the overall yield of transportation fuels from each ton of biomass from the Columbus facility, which has been lower than expected due to a delay introducing our new generation of catalyst to the facility and mechanical failures impeding desired chemical reactions in the BFCC reactor. In terms of overall process efficiency and reliability, we have previously generated products with an unfavorable mix that includes higher percentages of fuel oil and off specification product. Products with higher percentages of fuel oil result in lower product and RIN (as defined below) revenue and higher overall costs**. We have identified and intend to implement changes that we believe will further optimize our processes and increase reliability and on-stream percentage throughout our Columbus facility. We are also aiming to make reductions to our cost structure by, among other things, decreasing natural gas consumption by the facility. We do not expect to complete these optimization projects until we achieve additional research and development milestones and receive additional financing.

113.   KiOR's 2013 10-K continues, at length, concerning the severe structural designs

existing at the Columbus Facility that necessitated its shutdown:

- As discussed above, we have experienced issues in the past at our Columbus facility with **structural design bottlenecks and reliability, operations below nameplate capacity, unfavorable product mix** and higher costs due to overall process inefficiencies. 2013 10-K at 6.

- Our research and development team is focused on the continued advancement of our technology platform to maximize the value of our cellulosic gasoline and diesel by increasing the overall yield of our BFCC process and improving the composition of our products. We believe that we will achieve this by **developing our advanced catalysts systems, optimizing our reactor design and operating conditions and refining our processing technology**. *Id*. at 8.

- Issues that have adversely affected our operations and our stock price include: **Structural design bottlenecks and reliability issues that have limited the amount of wood that we can introduce to our BFCC system**, which has caused our Columbus facility to run significantly below its nameplate capacity for biomass of 500 bone dry tons per day and limited our ability to produce gasoline and diesel; **Delays in introducing our new generation of catalyst to the facility and mechanical failures impeding desired chemical reactions in the BFCC reactor**, which have caused lower overall yield of transportation fuels from each ton of biomass from the Columbus facility; **Mechanical reliability issues with**

<div align="center">57</div>

**the BFCC hydrotreater and catalyst contamination**, which has resulted in an output of unfavorable product mix that includes higher percentages of fuel oil, resulting in lower product and RIN revenue and higher overall costs; and **Frequent shutdown and start-up our BFCC hydrotreater**, which has resulted in off-specification product. *Id.* at 12.

- During the Columbus facility's early years of production and until the facility stabilizes operationally, the facility may be more susceptible to start-ups and shutdowns that will disrupt and delay our production activities for significant time periods. During 2013, **we experienced a number of such disruptions and delays, and we expect that we will experience such events for some period** following the Columbus optimization projects and upgrades and restarting the facility. *Id.* at 14.

- During the first quarter of 2014, we commenced a series of optimization projects and upgrades at our Columbus facility. The optimization projects and upgrades are targeted at improving throughput, yield and overall process efficiency and reliability. In terms of throughput, we have experienced issues with **structural design bottlenecks and reliability that have limited the amount of wood that we can introduce to our BFCC system**. These issues have caused the Columbus facility to run significantly below its nameplate capacity for biomass of 500 bone dry tons per day and limited our ability to produce cellulosic gasoline and diesel. We have identified and intend to implement changes to the BFCC, hydrotreater and wood yard that we believe will alleviate these issues. In terms of yield, we have identified **additional enhancements that we believe will improve the overall yield of transportation fuels from each ton of biomass from the Columbus facility**, which has been lower than expected due to a delay introducing our new generation of catalyst to the facility and mechanical failures impeding desired chemical reactions in the BFCC reactor. In terms of overall process efficiency and reliability, we have previously generated products with an unfavorable mix that includes higher percentages of fuel oil and off specification product. Products with higher percentages of fuel oil result in lower product and RIN revenue and higher overall costs. We have identified and intend to **implement changes that we believe will further optimize our processes and increase reliability and on-stream percentage throughout our Columbus facility**. *Id.* at 33.

114.    In fact, the extent of the ongoing structural design and mechanical problems was so severe, that the Company was forced to take an impairment of $185 million in connection with the Columbus Facility.  As explained in KiOR's 2013 10-K, the impairment was necessary due to the fact that Defendants were unable to "get the [Columbus Facility] to 'steady state'

operations" and, in light of the fact that the Columbus Facility admittedly had no "alternative uses in its current state," the amount of the impairment was based on the Columbus Facility's "salvage value." (Pages 32, 34)

115.    In other words, what Defendants once misleadingly classified as typical start-up problems, the 2013 10-K now revealed and admitted to be design problems that were "structural" in nature that went to the heart of the Columbus Facility's machinery and technology.

116.    Moreover, in support of Plaintiffs' claims, these structural design and mechanical failures persisted throughout the entire course of the "start-up phase" and Class Period.  The following table identifies the three general parts of the production process underlying the Columbus Facility's closure, the revelations in KiOR's 2013 10-K pertaining to these areas, and the statements obtained from various statements which establish the longstanding nature and severity of these problems throughout the Class Period:

| Columbus Facility Production Process | KiOR's 2013 10-K reveals… | The design and mechanical failures existed during the Class Period… |
|---|---|---|
| **Throughput**<br>• Biomass processing | "In terms of throughput, we have experienced issues with structural design bottlenecks and reliability that have limited the amount of wood that we can introduce to our BFCC system. These issues have caused the Columbus facility to run significantly below its nameplate capacity for biomass of 500 bone dry tons per day and limited our ability to produce cellulosic gasoline and diesel. We have identified and intend to implement changes to the BFCC, hydrotreater and wood yard that we believe will alleviate these issues." | • The Columbus Facility had "operational problems" and "design issues," including the woodchip conveyor system which did not properly supply the conversion system because it would jam or "plug[] up" and result in unexpected shutdowns.  (CW2)<br><br>• Biomass processing, including the wood chipping system and conveyer system, failed frequently and required substantial repairs.  (CW5)<br><br>• The biomass processing machinery, including the woodchip conveyor system, did not fuel the conversion system at the proper rates.  (CW4) |
| **Yield**<br>• BFCC Reactor<br>• Product Recovery | "In terms of yield, we have identified additional enhancements that we believe will improve the | • Technology specific design issues existed, in particular with regard to the Vapor Recovery Unit which needed to be |

| | | |
|---|---|---|
| • Hydrotreating | overall yield of transportation fuels from each ton of biomass from the Columbus facility, which has been lower than expected due to a delay introducing our new generation of catalyst to the facility and mechanical failures impeding desired chemical reactions in the BFCC reactor." | redesigned before operating smoothly. (CW1)<br><br>• The Columbus Facility had "operational problems" and "design issues," including that certain equipment was undersized and could not handle wastewater byproduct. (CW2)<br><br>• Components of the BFCC reactor at the Columbus Facility was undersized given certain technology problems associated with KiOR's then-current version of the catalyst. (CW4) |
| **Efficiency and Reliability**<br>• Finished Product<br>• Blendstock Specifications | "In terms of overall process efficiency and reliability, we have previously generated products with an unfavorable mix that includes higher percentages of fuel oil and off specification product. Products with higher percentages of fuel oil result in lower product and RIN (as defined below) revenue and higher overall costs." | • The Columbus Facility produced off-specification tar-like substance which resulted in failures along the production line to jam and require additional maintenance. (CW3)<br><br>• The Columbus Facility had "operational problems" and "design issues," including that the BFCC reactor yielded excess tar which jammed equipment. (CW2) |

117. KiOR's 2013 10-K was signed by Defendant Cannon, Christopher Artzer (as Interim Chief Financial Officer, Principal Financial Officer, and Principal Accounting Officer), and the following directors: D. Mark Leland, Samir Kaul, David J. Paterson, William Roach, and Gary L. Whitock. Defendant Cannon and Christopher Artzer also certified KiOR's 2013 10-K pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 7241). 2013 10-K, Exhibits 31.1 and 31.2.

118. Defendants (except Defendant Karnes) filed KiOR's Form 10-K for 2013Y after the market closed on March 17, 2014. KiOR's stock closed at $1.07 per share on March 17, 2014. On March 18, 2014, the following day, KiOR's stock closed at $0.65 per share on unusually heavy volume.

**THE DEFENDANTS INTENTIONALLY OR RECKLESSLY MISLED INVESTORS**

60

119.    The materially false and misleading statements and omissions discussed above were made by Defendants either intentionally and/or with reckless disregard to accuracy. Defendants' scienter stems from the Columbus Facility's pivotal role in KiOR's continued operation.  KiOR was operating under massive debt loads and heavy financing obligations.  The Company's only potential source of revenue was not only failing to generate product or sales, but was burning the Company's dwindling cash and credit at an astounding rate.  Moreover, two of KiOR's principal founders and stockholders significantly reduced their positions in the Company.

120.    Rather than concede defeat, Defendants intentionally and/or recklessly perpetrated a fraud by misleading investors to believe that the Columbus Facility was "turning the corner" and continued to artificially inflate the Company's profile and stock price by issuing baseless and totally unrealistic production estimates.  In return, Defendants orchestrated $279.5 million in additional debt financing.  2013 10-K at 15.  With these funds, Defendants were able to continue business, and continue paying themselves and their fellow executive officers and directors substantial salaries and compensation.  Further, with the Company's stock price artificially inflated, Defendants and other insiders were able to reap over $6.25 million in profit from insider sales.[9]

121.    Considering the facts at hand, Defendants acted with recklessness and/or intentional intent to deceive.

*Baseless and Unrealistic Projections to Raise Funds, Service Debt, and Continue Operations*

---

[9] For the illustrative purposes of the Complaint only, profits on the following insider trades are calculated based on the $0.65 adjusted closing market price per share of KiOR common stock on March 18, 2014.  Plaintiffs note that KiOR's stock price continued to decline as information pertaining to KiOR's operations penetrated the market.  On March 28, 2014, the adjusted closing price per share of KiOR common stock was $0.41.  Plaintiffs reserve the right to recalculate profits and/or losses upon further information at a later date.

122.    Throughout the Class Period, Defendants affirmed and reaffirmed production estimates that had no bearing on reality and, in light of the facts known at the time, were wildly misleading as to truth and/or accuracy.  The following table provides lists Defendants' reckless estimates and the then-current production facts:

| Date | Current Production Estimate (gal.) | Actual Past Production (gal.) | Production Required Estimate (gal.) | Longest Period of Constant Operation |
|------|-----------------------------------|------------------------------|-------------------------------------|--------------------------------------|
| Nov. 8, 2012[10] | 500,000 for 4Q12 | 0 | 9,400/day X 53 days | 3 days |
| May 9, 2013[11] | 300,000 for 2Q12 | 5,000 | 5,800 X 52 days | 4.5 days |
| Jul. 1, 2013[12] | 3,000,000 for fiscal 2013 | 185,134 | 15,638/day X 180 days | 30 days |
| Aug. 31, 2013[13] | 1,000,000 for fiscal 2013 | 357,532 | 5,353/day X 120 days | 30 days |
| Nov. 1, 2013[14] | 1,000,000 for fiscal 2013 | 676,062 | 5,400/day X 60 days | 57 days |

123.    Defendants' deliberate recklessness is evident based on the Columbus Facility's past production capabilities.  In each instance, the production estimate was impossible given the production constraints of the Columbus Facility, especially in light of the Columbus Facility's demonstrated on-stream run-times and the ongoing design and mechanical problems.

124.    Defendants' deliberate recklessness is also evident given that Defendants were

---

[10] Defendants issued the production estimate during an earnings call held on August 14, 2012, and reaffirmed the estimate on the following earnings call held on November 8, 2012.  On the November 8, 2012 call, Defendant Cannon also indicated that the Columbus Facility's longest "continuous production" run was three days.

[11] Defendants issued the production estimate during an earnings call held on May 9, 2013.  During the same call, Cannon advised of a recent "production run" that "nearly matched [the Columbus Facility's average performance" during the first quarter, which was 110 hours.

[12] Defendants reaffirmed the production estimate in a press release issued on July 1, 2013.  During an earnings conference call held on August 8, 2013, Defendant Cannon indicated that the Columbus Facility's longest continuous production run had reached 30 days.

[13] Defendants issued the production estimate in a press release on September 19, 2013.  During an earnings conference call held on August 8, 2013, Defendant Cannon indicated that the Columbus Facility's longest continuous production run had reached 30 days.

[14] Defendants affirmed the production estimate during an earnings conference call held on November 7, 2013.  During the same call, Defendant Cannon indicated that the Columbus Facility's longest continuous production run had reached 57 days.

aware of the ongoing design and mechanical problems impeding production.  KiOR's operations staff held daily operational meetings with the Columbus Facility's management and engineers from KiOR's headquarters.  (CW2, CW4)  As recalled by CW2 and CW4, who attended these daily meetings in person, discussion were consistently focused on plant and production issues. (CW2)  According to CW4, the Columbus Facility's Operations Manager, the Columbus Facility's process engineers, plant managers, and production engineering staff would notify Defendant Cannon and other senior management as soon as possible whenever design issues and/or technical problems were discussed at the daily operational meetings.  (CW4)  The ongoing design and mechanical problems were apparent to everyone shortly after commencement of the start-up phase.  (CW2, CW5)  As recalled by CW4, senior management was aware that the Columbus Facility's technical problems were discussed constantly.  (CW4)

125.   The critical importance of the Columbus Facility itself to KiOR's overall operations further supports that Defendants were aware of the ongoing design and mechanical failures at the Columbus Facility.  Indeed, the Columbus Facility was KiOR's sole commercial production facility; KiOR's ability to remain a going concern depended on the Columbus Facility reaching nameplate capacity.  The ability to secure additional financing, not only for continued operations at the Columbus Facility but also for additional commercial production facilities (*i.e.*, the Natchez Facility and Columbus Facility II), depended on the viability of the Columbus Facility and its ability to produce as promised.  KiOR's quarterly and annual reports during the Class Period even stated that the "[t]he lack of any committed sources of financing other than those discussed above raises substantial doubt about our ability to continue as a going concern" and that KiOR's ability to secure additional financing "[would] be

contingent upon, among other things, successful start-up of [its] Columbus Facility . . . ."

126.    The need for additional financing was underscored by the terms of KiOR's existing debt obligations and, in particular, its loan with the Mississippi Development Authority (the MDA Loan).  Without any substantial revenue, the Company was forced to fund itself through hundreds of millions of dollars in debt financing.  KiOR obtained the financing it needed from private and government entities.  However, the loans required KiOR to make significant and frequent interest payments, which KiOR was able to do by issuing warrants to purchase substantial amounts of its common stock.

127.    The Company's issuance of warrants is chronicled throughout its quarterly and annual SEC filings during the Class Period.  According to KiOR's Form 10-Q filed on November 12, 2013, KiOR issued the following warrants in connection with its loan agreements: (a) initial warrants to purchase 1,161,790 shares at $11.62 per share; (b) ATM warrants to purchase 619,867 shares at $5.71 per share (with provisions to purchase additional shares based on the amount of the loan balance); (c) ATM warrants to purchase 480,123 shares at prices ranging from $3.10 to $5.06 per share; (d) Drawdown warrants to purchase 2,139,997 shares at prices ranging from $3.10 to $5.06 per share; (e) Initial PIK warrants to purchase 334,862 shares at prices ranging from $11.62 to $13.15 per share; (f) Subsequent PIK warrants to purchase 478,626 shares at $5.71 per share; and additional (g) Subsequent PIK warrants to purchase 377,238 shares at prices ranging from $3.10 to $5.06 per share.  These warrants were made at various times throughout the Class Period coinciding with interest payment due dates and loan term modifications.

128.    KiOR's ability to satisfy its payment obligations through warrants depended on

the Company's stock price.  Consequently, to obtain the financing it needed to keep the Company afloat, Cannon and Karnes perpetuated the misrepresentations about the viability and production capabilities of the Columbus Facility so as to keep KiOR attractive to prospective investors.  As long as investors believed in the viability of the Columbus Facility, the Company's stock price would remain high and KiOR's warrants would remain valuable.

129.    With regard to the MDA Loan, in exchange for $75 million in investment, KiOR promised to "make specified investments within Mississippi by December 31, 2015, including an aggregate $500.0 million investment in property, plant and equipment located in Mississippi and expenditures for wages and direct local purchases in Mississippi totaling $85.0 million."  Failure to do so would trigger a default resulting in "the acceleration of repayment amounts due under the loan agreement."  The MDA Loan was secured by KiOR's equipment, land, and buildings. The only way KiOR would have been in a position to satisfy its intrastate investment obligations under the MDA Loan was to successfully draw enough investment to facilitate the construction of either the Natchez Facility or the Columbus Facility II.  However, as stated previously, KiOR's ability to secure additional financing "[would] be contingent upon, among other things, successful start-up of [its] Columbus Facility . . . ."  Without the successful portrayal of the Columbus Facility, KiOR was not in a position to secure the financing necessary to construct its second commercial production facility, was not going to be able to satisfy its obligations under the MDA Loan, and would have been responsible to repay its $75 million on an accelerated basis, which would not have been possible given the accelerating cash burn occurring at the Company.  Again, by perpetuating the misrepresentations regarding the production capabilities of the Columbus Facility, Defendants were able to make KiOR and its Columbus Facility appear

as an attractive investment opportunity and keep the Company's stock price artificially inflated.

130.    Not only did good news about the Columbus Facility dictate future financing, but it also enabled Defendants Cannon and Karnes to remain employed and continue receiving their lucrative salaries.  According to KiOR's most recent proxy statement (Schedule 14A filed on April 17, 2013), Cannon's compensation for the years 2011 and 2012 was approximately $4.2 million and $4.5 million, respectively.  Karnes' compensation for 2011 and 2012 was approximately $7.7 million and $2.0 million.  Additionally, Cannon held well over five million exercisable stock options with exercise prices between $0.08 and $1.98 as of the date of the proxy statement.  Based on KiOR's stock price at the beginning of the Class Period of $6.86, Cannon's options were capable of netting roughly $30 million in proceeds (*i.e.*, the product of the stock price at the beginning of the Class Period less the exercise price times the number of options).

131.    The Columbus Facility's central role to KiOR's overall ability to survive qualifies it as a core operation of the Company and, therefore, CEO Cannon and CFO Karnes were intimately aware of its production deficiencies and design flaws.  Consequently, Cannon and Karnes were cognizant of and responsible for the oral and written misrepresentations, falsehoods, and omissions made during earnings conference calls and within certified SEC disclosures throughout the Class Period while reassuring investors and lenders alike of unrealistic production estimates and that the Columbus Facility was "turning the corner towards steady state operations" and that the "very, very typical" start-up issues would be resolved in short time.

*Accumulated Deficit and Operating Loss*

132.    Defendants' recklessness and/or intent to mislead is also evident in light of the red

66

flags arising from the Columbus Facility's operations.  Throughout the Class Period, Defendant Cannon was KiOR's CEO; Karnes served as KiOR's CFO until December 2013.  Given their respective positions, each Cannon and Karnes was aware (or should have been aware) of: (i) KiOR's increasing accumulated debt; (ii) KiOR's expanding net operating losses; and (iii) the Columbus Facility's burgeoning "start-up" costs.  Cannon and Karnes understood the severity of these red flags (or were deliberately reckless in disregarding them), yet proceeded to make the egregious and baseless representations about the Columbus Facility and KiOR's operations as a whole set forth above.

133.    KiOR's accumulated deficit, as the second quarter of 2011, was just over $100 million.  As of March 31, 2014, KiOR's accumulated deficit grew by *600%* to $604.9 million.  Likewise, in the second quarter of 2011, KiOR's net operating loss was $79 million.  As of March 31, 2014, it grew by almost *700%* to $549 million.  KiOR's accumulated deficit and net operating loss grew as follows over the interim:

| Period | Deficit (millions) | Net Operating Loss (millions) |
|---|---|---|
| 2Q11 10-Q | $100.70 | $79 |
| 3Q11 10-Q | $115.40 | $93.80 |

67

| | | |
|---|---|---|
| **4Q11 10-K** | $130.40 | $108.70 |
| **1Q12 10-Q** | $147.20 | $125.30 |
| **2Q12 10-Q** | $170.20 | $148.30 |
| **3Q12 10-Q** | $197.10 | $175.20 |
| **4Q12 10-K** | $226.80 | $204.90 |
| **1Q13 10-Q** | $258.10 | $234.10 |
| **2Q13 10-Q** | $296.60 | $265.40 |
| **3Q13 10-Q** | $339.70 | $299.30 |
| **4Q13 10-K** | $574.30 | $525.50 |
| **1Q14 10-Q** | $604.90 | $549.00 |

134.    KiOR's increasing deficit and net operating loss was exacerbated by the Columbus Facility's unyielding "start-up" costs, which were increasing at a staggering rate. Notwithstanding the fact that in the second quarter of 2011 Defendants estimated the entire "start-up" cost for the Columbus Facility to be $20 million, within just over two years the "start-up" costs had more than *tripled* to $69.2 million.  The Columbus Facility's estimated and actual "start-up" costs over the Class Period were as follows:

| Date | Estimated Total Start-Up Cost (millions) | Actual Total Start-Up Costs (millions) |
|---|---|---|
| **1Q12 10-Q** | $16 | $1.90 |
| **2Q12 10-Q** | $4-$10 | $7.9 |
| **3Q12 10-Q** | $3-$6 | $18.1 |
| **4Q12 10-K** | $7.5 | $30.2 |

68

| | | |
|---|---|---|
| **1Q13 10-Q** | $4-$5 | $41.2 |
| **2Q13 10-Q** | $4-$5 | $54.1 |
| **3Q13 10-Q** | $4-$5 | $69.2 |
| **4Q13 10-K** | $27.2[15] | Unknown[16] |

135.    As CEO and CFO, Cannon and Karnes would have been alerted to the failing state of the Company. Yet they proceeded to make the egregious and baseless representations about the Columbus Facility and KiOR's operations as a whole set forth above.  Defendants' refusal or failure to acknowledge these glaring red flags supports a strong inference of scienter.

*Karnes' Abrupt Resignation*

136.    Defendants' scienter is further evident from Karnes' unexpected and unexplained resignation from the Company in December 2013.  On December 4, 2013, the Company announced that Karnes had abruptly resigned as CFO from the KiOR.  No reason was provided and, significantly, the Company failed to state that the resignation was for personal reasons or that it did not have anything to do with the way in which KiOR was operating or presenting its production forecasts.

137.    Defendants' response to Karnes' resignation is in stark contrast to the resignation of other directors and officers.  For example, when former director Condoleezza Rice, Ph.D., resigned from KiOR's Board of Directors just a few weeks after Karnes on December 20, 2013, the Company released a statement in a Form 8-K filed with the SEC on December 23, 2013,

---

[15] This figure includes Defendants' estimates of $10 million for further capital expenditures relating to the "optimization" of the Columbus Facility and $17.2 million for costs associated with shutting down the Columbus Facility and keeping it idle while the "optimization" projects are completed.

[16] To date, Defendants have not revealed the amount of the "start-up" costs for the fourth quarter of 2013; instead, as discussed at length in the Company's 2013 10-K, KiOR accounted for a loss on impairment of $185 million in connection with the Columbus Facility.

explaining that Dr. Rice was resigning because of "business commitments and personal time constraints" and not because of any "disagreement with the Company on any matter related to the Company's operations, policies or practices."  KiOR, in the Form 8-K, went as far as to even thank Dr. Rice for her "invaluable services and contribution to the Company."

138.    Additionally, on March 15, 2013, KiOR's former Senior Vice President of Operations, W. Roger Lyle, resigned.  The Company issued a press release on March 18, 2013, informing the public that Mr. Lyle's "decision to resign was for personal reasons."  Similar to Dr. Rice, KiOR noted that it "greatly appreciate[d] Mr. Lyle's service and wishe[d] him and his family the best."

139.    Karnes' abrupt resignation gives rise to a strong inference of scienter because: (i) Karnes was directly involved in the issuance of at least *four* completely baseless and unrealistic production estimates; (ii) Karnes was aware of the accumulated deficit, staggering operating costs, and significant stock sell-offs by founders and beneficial owners; (iii) Karnes was aware of the ongoing severe design and mechanical problems at the Columbus Facility; and (iv) KiOR offered no explanation as to Karnes' resignation and declined to offer any of the niceties usually given to departing directors and executives.

*Insider Trades*

140.    Several directors and executive officers, including Defendants Cannon and Karnes, engaged in unusual and atypical insider transactions while the Company's stock was artificially inflated during the Class Period.

       i.    Defendant Fred Cannon

141.    The following charts display Defendant Cannon's insider transactions, as obtained

from his SEC Form 4 filings:

| | Date Sold | Quantity Sold | Percentage of Ownership | Price Per Share | Proceeds | Profit |
|---|---|---|---|---|---|---|
| Cannon | 3/1/2012 | 8,830 | 2.848% | $8.64 | $76,291.20 | $70,552 |
| | 3/15/2012 | 4,771 | 1.504% | $8.94 | $42,652.74 | $39,552 |
| | 9/4/2012 | 8,944 | 2.863% | $7.36 | $65,827.84 | $60,014 |
| | 3/4/2013 | 9,402 | 3.098% | $5.46 | $51,334.92 | $45,224 |
| | 3/12/2013 | 22,894 | 6.107% | $5.8 | $132,785.20 | $117,904 |
| | 5/7/2013 | 37,082 | 8.071% | $4.88 | $180,960.16 | $156,857 |
| | 9/4/2013 | 15,672 | 3.711% | $1.9312 | $30,265.77 | $20,079 |
| | 3/6/2014 | 10,218 | 2.512% | $1.5249 | $15,581.43 | $8,940 |
| | 3/11/2014 | 29,332 | 6.146% | $1.2584 | $36,911.39 | $17,846 |
| | 3/17/2014 | 70,862 | 10.454% | $1.1042 | $78,245.82 | $32,186 |
| Class Period Totals | | 204,406 | | | $591,913 | $459,050 |

☐ – Class Period transactions (November 8, 2012 through March 17, 2014)

142.    As indicated in the above chart, Cannon reaped just under $600,000 in proceeds and approximately $460,000 in profits from insider trades during the Class Period. By engaging in these insider trades, Cannon was able to more than **double** his $341,250 base salary for fiscal 2013. These class period stock sales were unusual given the large percentage of holdings sold compared to Cannon's prior trading history. Despite becoming a publicly traded company in June 2011, Cannon had not sold any shares prior to March 2012. This is especially noteworthy given the significant number of exercisable options he possessed at the time. Moreover, Cannon's decision to begin selling his stock shortly after February 2013 coincides with the departure of several significant members of the operations staff, including CW1, CW2, CW4, and Greg Neve. The sizes and timing of Cannon's trades, as compared with his pre- and post-Class Period trading activity, is indicative of a motivation to benefit financially from the Company's stock price while it was being inflated by the continued misrepresentations and omissions throughout the Class Period.

143.     Additionally, as explained above, the ability of KiOR to remain a going concern depended on Cannon's ability to portray the Columbus Facility in the most positive light possible so as to be able to secure financing for operations.  Without financing, KiOR would not be able to survive and, by closing its doors, would put Cannon out of work.  Given Cannon's salary and outstanding stock options, he was highly motivated to keep KiOR open and its stock price as high as possible.  Cannon's compensation for 2011 and 2012 was $4.2 million and $4.5 million, of which $3.9 million and $4.1 million were stock awards.  Additionally, Cannon held well over five million exercisable stock options with exercise prices between $0.08 and $1.98 as of the date of the proxy statement.  Depending on his ability to maintain an inflated stock price, Cannon stood to benefit by tens of millions of dollars.  For example, based on KiOR's stock price at the beginning of the Class Period of $6.86, Cannon's options were capable of netting roughly $30 million in proceeds.  Cannon compensation from KiOR was material and, in part, motivated him to perpetuate the fraudulent misrepresentations and omissions at issue herein.

(ii)     Defendant John Karnes

144.     The following charts display Defendant Karnes' insider transactions, as obtained from his SEC Form 4 filings:

| | Date Sold | Quantity Sold | Percentage of Ownership | Price Per share | Proceeds | Profit |
|---|---|---|---|---|---|---|
| Karnes | 3/6/2012 | 2,179 | 4.358% | $8.14 | $17,737.06 | $16,321 |
| | 3/15/2012 | 4,826 | 7.564% | $8.93 | $43,096.18 | $39,959 |
| | 9/4/2012 | 1,789 | 3.033% | $7.36 | $13,167.04 | $12,004 |
| | 3/4/2013 | 2,083 | 3.642% | $5.50 | $ 11,456.50 | $10,103 |
| | 3/12/2013 | 10,103 | 11.287% | $5.76 | $ 58,193.28 | $51,626 |
| | 5/7/2013 | 13,517 | 10.803% | $4.88 | $65,962.96 | $57,177 |
| | 9/4/2013 | 2,053 | 1.84% | $1.9322 | $3,966.81 | $2,632 |
| Class Period Totals | | 29,545 | | | $152,747 | $133,542 |

[　　　　　] – Class Period transactions (November 8, 2012 through March 17, 2014)

145.    As indicated in the above chart, Karnes secured over $152,000 in proceeds and approximately $130,000 in profits from insider trades during the Class Period.  These class period stock sales were unusual given the large percentage of holdings sold compared to Karnes's prior trading history.  Despite becoming a publicly traded company in June 2011, Karnes had not sold any shares prior to March 2012.  Moreover, Karnes' decision to begin selling his stock shortly after February 2013 coincides with the departure of several significant members of the operations staff, including CW1, CW2, CW4, and Greg Neve.  The sizes and timing of Karnes' trades, as compared with his pre- and post-Class Period trading activity, is indicative of his motivation to benefit financially from the Company's stock price while it was being inflated by their continued misrepresentations and omissions.

146.    Additionally, as explained above, the ability of KiOR to remain a going concern depended on Karnes' ability to portray the Columbus Facility in the most positive light possible so as to be able to secure financing for operations.  Without financing, KiOR would not be able to survive and, by closing its doors, would put Karnes out of work.  Given Karnes' salary and outstanding stock options, he was highly motivated to keep KiOR open and its stock price as high as possible.  Karnes' compensation for 2011 and 2012 was $7.7 million and $2.0 million, of which approximately $7.5 million and $1.7 million were stock and option awards.  Karnes' salary was material and, in part, motivated him to perpetuate the fraudulent misrepresentations and omissions at issue herein.

(iii)    John Kasbaum, Senior Vice President of Commercial

147.    The following charts display non-party John Kasbaum ("Kasbaum")'s insider

73

transactions, as obtained from his SEC Form 4 filings:

| | Date Sold | Quantity Sold | Percentage of Ownership | Price Per Share | Proceeds | Profit |
|---|---|---|---|---|---|---|
| Kasbaum | 6/27/2012 | 1,439 | 20.268% | $8.755 | $12,598.45 | $11,663 |
| | 3/12/2013 | 7,866 | 14.146% | $5.82 | $45,780.12 | $40,667 |
| | 5/7/2013 | 10,094 | 12.48% | $4.88 | $49,258.72 | $42,698 |
| | 6/25/2013 | 1,251 | 1.767% | $4.552 | $5,694.55 | $4,881 |
| | 3/11/2014 | 9,995 | 10.578% | $1.2593 | $12,586.70 | $6,090 |
| | 3/17/2014 | 13,792 | 11.292% | $1.1038 | $15,223.61 | $6,259 |
| Class Period Totals | | 42,998 | | | $128,544 | $100,595 |

                 – Class Period transactions (November 8, 2012 through March 17, 2014)

148. Kasbaum is the Senior Vice President of Commercial at KiOR. He is responsible for the commercial operations and business development strategy, among other things. Kasbaum's base salary for 2013 was $243,000.[17] Considering his salary, Kasbaum materially benefited from selling his KiOR stock while the price was artificially inflated; as indicated in the above chart, Kasbaum profited by over $100,000, nearly 50% of his base salary.

149. Kasbaum's insider trades further support an inference of scienter in light of the timing and amount of the transactions. During the "start-up phase," while the Columbus Facility was attempting to overcome severe mechanical design issues, Kasbaum approximately 25% of his KiOR common stock holdings. During the "optimization phase," just days prior to Defendants' announcement that the Columbus Facility would be shutdown in its entirety, Kasbaum sold off an additional 20% of his position. Moreover, Kasbaum's decision to begin selling his stock shortly after February 2013 coincides with the departure of several significant members of the operations staff, including CW1, CW2, CW4, and Greg Neve. Kasbaum's trading patterns suggest that he, as well as the rest of KiOR's executive management, was aware

---

[17] KiOR Form 10-K/A filed April 30, 2014.

of the ongoing design problems at the Columbus Facility and decided to reap unfair profits by selling substantial amounts of stock before the truth was revealed to the rest of the investing public.  Kasbaum's class period stock sales were also unusual given the large percentage of holdings sold compared to his prior trading history.

(iv)    Paul O'Connor, Former and Current Director

150.    The following charts display non-party Paul O'Connor ("O'Connor")'s insider transactions, as obtained from his SEC Form 4 filings:

| | Date Sold | Quantity Sold | Percentage of Ownership | Price Per Share | Proceeds | Profit |
|---|---|---|---|---|---|---|
| O'Connor | 5/23/2012 | 834,544 | 6.326% | $8.84 | $7,377,369 | $6,834,915 |
| | 10/31/2012 | 10,000 | 0.5% | $6.31 | $63,100 | $56,600 |
| | 11/1/2012 | 10,000 | 0.51% | $6.5 | $65,000 | $58,500 |
| | 11/2/2012 | 10,000 | 0.51% | $6.6 | $66,000 | $59,500 |
| | 11/5/2012 | 10,000 | 0.51% | $6.67 | $66,700 | $60,200 |
| | 11/06/2012 | 10,000 | 0.52% | $6.68 | $66,800 | $58,500 |
| | 11/7/2012 | 10,000 | 0.52% | $6.76 | $67,600 | $55,700 |
| | 11/8/2012 | 10,000 | 0.52% | $7.41 | $74,100 | $55,100 |
| | 11/9/2012 | 10,000 | 0.53% | $7.65 | $76,500 | $53,300 |
| | 11/12/2012 | 10,000 | 0.53% | $7.31 | $73,100 | $56,200 |
| | 11/13/2012 | 10,000 | 0.53% | $6.72 | $67,200 | $52,700 |
| | 11/14/2012 | 10,000 | 0.54% | $6.43 | $64,300 | $53,500 |
| | 11/15/2012 | 10,000 | 0.54% | $6.43 | $64,300 | $54,300 |
| | 11/16/2012 | 10,000 | 0.54% | $6.1 | $61,000 | $55,600 |
| | 11/19/2012 | 10,000 | 0.54% | $6.05 | $60,500 | $53,100 |
| | 11/20/2012 | 10,000 | 0.55% | $6.5 | $65,000 | $52,900 |
| | 11/21/2012 | 10,000 | 0.55% | $6.22 | $62,200 | $55,400 |
| | 11/22/2012 | 10,000 | 0.55% | $6.16 | $61,600 | $53,500 |
| | 11/26/2012 | 10,000 | 0.56% | $5.98 | $59,800 | $53,800 |
| | 11/27/2012 | 10,000 | 0.56% | $6.27 | $62,700 | $51,700 |
| | 11/28/2012 | 10,000 | 0.56% | $5.92 | $59,200 | $53,200 |
| | 11/29/2012 | 10,000 | 0.57% | $6 | $60,000 | $53,800 |
| | 11/30/2012 | 10,000 | 0.57% | $6.08 | $60,800 | $53,000 |
| | 12/3/2012 | 10,000 | 0.57% | $6.21 | $62,100 | $53,900 |
| | 12/5/2012 | 10,000 | 0.58% | $5.96 | $59,600 | $53,700 |
| | 12/6/2012 | 10,000 | 0.58% | $5.94 | $59,400 | $59,400 |
| | 12/7/2012 | 10,000 | 0.58% | $6.19 | $61,900 | $57,100 |
| | 12/7/2012 | 10,000 | 0.58% | $6 | $60,000 | $55,700 |
| | 12/10/2012 | 10,000 | 0.58% | $6.03 | $60,300 | $55,100 |
| | 12/11/2012 | 10,000 | 0.59% | $5.82 | $58,200 | $57,100 |
| | 12/12/2012 | 10,000 | 0.59% | $5.97 | $59,700 | $54,500 |
| | 12/13/2012 | 10,000 | 0.59% | $6.03 | $60,300 | $54,600 |
| | 12/14/2012 | 10,000 | 0.6% | $5.95 | $59,500 | $56,100 |

|  | Date Sold | Quantity Sold | Percentage of Ownership | Price Per Share | Proceeds | Profit |
|---|---|---|---|---|---|---|
|  | 12/17/2012 | 10,000 | 0.6% | $6.04 | $60,400 | $55,900 |
|  | 12/18/2012 | 10,000 | 0.6% | $6.02 | $60,200 | $58,200 |
|  | 12/19/2012 | 10,000 | 0.6% | $6.59 | $65,900 | $58,500 |
|  | 12/20/2012 | 10,000 | 0.6% | $6.36 | $63,600 | $66,000 |
|  | 12/21/2012 | 10,000 | 0.6% | $6.22 | $62,200 | $63,600 |
|  | 12/27/2012 | 10,000 | 0.6% | $6.16 | $61,600 | $61,600 |
|  | 12/27/2012 | 10,000 | 0.6% | $6.36 | $63,600 | $59,200 |
|  | 12/28/2012 | 10,000 | 0.6% | $6.1 | $61,000 | $59,200 |
|  | 12/28/2012 | 10,000 | 0.6% | $6.11 | $61,100 | $58,900 |
|  | 12/31/2012 | 10,000 | 0.6% | $6.26 | $62,600 | $58,600 |
|  | 12/31/2012 | 10,000 | 0.6% | $6.24 | $62,400 | $58,100 |
|  | 1/2/2013 | 10,000 | 0.7% | $6.47 | $64,700 | $56,300 |
|  | 1/3/2013 | 10,000 | 0.7% | $6.5 | $65,000 | $56,200 |
|  | 1/4/2013 | 10,000 | 0.7% | $7.25 | $72,500 | $55,600 |
|  | 1/7/2013 | 10,000 | 0.7% | $7.01 | $70,100 | $55,400 |
|  | 1/8/2013 | 10,000 | 0.7% | $6.81 | $68,100 | $54,700 |
|  | 1/9/2013 | 10,000 | 0.7% | $6.57 | $65,700 | $54,100 |
|  | 1/10/2013 | 10,000 | 0.7% | $6.57 | $65,700 | $58,500 |
|  | 1/11/2013 | 10,000 | 0.7% | $6.54 | $65,400 | $55,700 |
|  | 1/14/2013 | 10,000 | 0.7% | $6.51 | $65,100 | $55,100 |
|  | 1/15/2013 | 10,000 | 0.4% | $6.46 | $64,600 | $53,300 |
|  | 1/16/2013 | 10,000 | 0.4% | $6.28 | $62,800 | $56,200 |
|  | 1/17/2013 | 10,000 | 0.4% | $6.27 | $62,700 | $52,700 |
|  | 1/18/2013 | 10,000 | 0.4% | $6.21 | $62,100 | $53,500 |
|  | 1/22/2013 | 10,000 | 0.4% | $6.19 | $61,900 | $54,300 |
|  | 1/23/2013 | 10,000 | 0.4% | $6.12 | $61,200 | $55,600 |
|  | 1/24/2013 | 10,000 | 0.4% | $6.06 | $60,600 | $53,100 |
|  |  |  |  |  |  |  |
| BIOeCON | 3/13/2013 | 15,000 | 1.5% | $6.03 | $90,450 | $80,700 |
|  | 3/14/2013 | 15,000 | 1.5% | $6 | $90,000 | $80,250 |
|  | 3/15/2013 | 15,000 | 1.5% | $6.09 | $91,350 | $81,600 |
|  | 3/18/2013 | 8,824 | 0.9% | $6.05 | $53,385 | $47,649 |
|  | 6/6/2013 | 11,176 | 1.18% | $4.11 | $45,933 | $38,669 |
|  | 9/5/2013 | 25,000 | 1.3% | $1.71 | $42,750 | $26,500 |
|  | 9/6/2013 | 25,000 | 1% | $1.51 | $37,750 | $21,500 |
|  | 9/9/2013 | 100,000 | 4.2% | $1.42 | $142,000 | $77,000 |
|  | 9/10/2013 | 50,000 | 2.2% | $1.74 | $87,000 | $54,500 |
|  | 9/26/2013 | 43,700 | 2% | $2.89 | $126,293 | $97,888 |
|  | 9/30/2013 | 56,300 | 2.6% | $2.74 | $154,262 | $117,667 |
| Class Period Totals |  | 955,000 |  |  | $4,712,473 | $4,029,323 |

☐ – Class Period transactions (November 8, 2012 through March 17, 2014)

151.   O'Connor has been a member of KiOR's Board of Directors since March 18, 2014.  O'Connor previously served on the Board of Directors from November 2007 through June

76

2012.  O'Connor's trading activity includes trades by and/or on behalf of himself and BIOeCON

B.V. and affiliates, which is one of KiOR's founders and significant stockholders.  BIOeCON

B.V. is a privately held company dedicated to "develop[ing] innovative breakthrough technology

for the conversion of non-food biomass into renewable fuels, chemicals and energy."  O'Connor

is the managing director of BIOeCON B.V. and currently serves as its Director of Science and

Technology.  O'Connor and BIOeCON B.V. are co-founders of KiOR and have been significant

KiOR shareholders since at least 2012.

152.    As a director and significant shareholder, O'Connor was privy to information not

shared with the investing public.  Specifically, he was aware of the true extent of the ongoing

design problems at the Columbus Facility and its realistic capabilities.

153.    Between September 2012 and December 2013 along, all within the "start-up

phase," O'Connor sold off just under 1 million shares for proceeds totaling over $4.7 million and

profit of just over $4 million.  O'Connor decreased his overall position in KiOR stock by over

50% during the Class Period, all before Defendants revealed that the Columbus Facility would

be shutdown for "optimization."  O'Connor's trading history supports an inference of scienter

among Defendants.

(v)    Christopher Artzer, President, Interim CFO, and General Counsel

154.    The following charts display non-party Artzer's insider transactions, as obtained

from his SEC Form 4 filings:

| | Date Sold | Quantity Sold | Percentage of Ownership | Price Per Share | Proceeds | Profit |
|---|---|---|---|---|---|---|
| Artzer | 3/20/12 | 2,569 | 32% | $9.19 | $23,609 | $21,939 |
| | 3/12/2013 | 7,708 | 25.7% | $5.82 | $44,861 | $39,851 |
| | 5/7/2013 | 9,802 | 17.89% | $4.88 | $47,834 | $41,463 |
| | 3/11/2014 | 9,823 | 14.13% | $1.2587 | $12,364 | $5,979 |
| | 3/17/2014 | 18,203 | 16.04% | $1.1042 | $20,100 | $8,268 |
| Class | | 48,105 | | | $148,768 | $95,561 |

| | Date Sold | Quantity Sold | Percentage of Ownership | Price Per Share | Proceeds | Profit |
|---|---|---|---|---|---|---|
| Period Totals | | | | | | |

　　　　　　　　　　– Class Period transactions (November 8, 2012 through March 17, 2014)

155.　　Artzer is KiOR's current President, Interim CFO, and General Counsel.  He assumed his role as Interim CFO after Defendant Karnes' abrupt resignation in December 2013. Artzer became KiOR's President after Defendant Cannon resigned the role in March 2014.  As part of the executive management team, Artzer was aware of the ongoing design problems at the Columbus Facility and its true capabilities.

156.　　Artzer's trading history, similar to Karnes' as discussed above, is indicative of the fact that KiOR's executive management were aware of the true state of affairs at the Columbus Facility and decided to materially benefit from it by trading on inside information while the Company's stock price was inflated.  Artzer's base salary was $285,000 in 2013.[18]  Accordingly, by selling off approximately $150,000 worth of KiOR stock for a profit of just under $100,000, all within the "start-up phase" period and just hours prior to the revelation of the Columbus Facility's shutdown, Artzer was able to materially benefit by selling the stock while it was artificially inflated.   Artzer's class period stock sales were also unusual given the large percentage of holdings sold compared to his prior trading history.

(vi)　　Lyle W. Roger, Former Senior Vice President of Operations

157.　　The following charts display non-party Lyle W. Roger ("Roger")'s insider transactions, as obtained from his SEC Form 4 filings:

| | Date Sold | Quantity Sold | Percentage of Ownership | Price Per Share | Proceeds | Profit |
|---|---|---|---|---|---|---|
| Roger | 3/15/2012 | 1,542 | 32.32% | $9.0239 | $13,915 | $12,913 |

---

[18] KiOR Form 10-K/A filed April 30, 2014.

78

| | Date Sold | Quantity Sold | Percentage of Ownership | Price Per Share | Proceeds | Profit |
|---|---|---|---|---|---|---|
| | 9/18/2012 | 6,893 | 24.5% | $8.37 | $57,694 | $53,214 |
| | 3/12/2013 | 9,246 | 18% | $5.77 | $53,349 | $47,339 |
| Class Period Totals | | 17,681 | | | $124,958 | $100,553 |

— Class Period transactions (November 8, 2012 through March 17, 2014)

158.    Roger served as KiOR's Senior Vice President of Operations from September 2011 through March 2013.  As part of the executive management team, and specifically as Vice President of Operations, Roger was aware of the ongoing problems at the Columbus Facility and its true inability to produce fuel at the levels represented by Defendants.

159.    Roger's salary for 2012 was $275,000.[19]  Roger received less than $100,000 in base salary during 2013.[20]  Accordingly, Roger materially benefited by selling the stock that he did while the price was artificially inflated; in fact, Roger increased his 2012 compensation by approximately 20% and nearly 50% in 2013 before leaving the Company.

160.    The timing of Roger's insider trades also raises suspicion.  Roger's trades in September 2012 and March 2013 occurred at the beginning of the "start-up phase."  According to the factual accounts from the confidential witnesses, the Columbus Facility's design problems were evident right away.  Roger appears to have recognized the extent of the problems and decided to sell stock while the price was still artificially inflated.  Roger's class period stock sales were also unusual given the large percentage of holdings sold compared to his prior trading history.

(vii)    Stuart Peterson, Former 40% Shareholder

161.    The following charts display non-party Stuart Peterson ("Peterson")'s insider

---

[19] KiOR Schedule DEF 14A, filed April 17, 2013, p. 25.
[20] KiOR Form 10-K/A filed April 30, 2014.

transactions, as obtained from his SEC Form 4 filings:

| | Date Sold | Quantity Sold | Percentage of Ownership | Price Per Share | Proceeds | Profit |
|---|---|---|---|---|---|---|
| Peterson | 11/9/2012* | 500,000 | 2.85% | -- | -- | -- |
| | 3/28/2013* | 500,000 | 2.94% | -- | -- | -- |
| | 5/31/2013* | 1,000,000 | 6.05% | -- | -- | -- |
| | 6/28/2013* | 1,000,000 | 6.44% | -- | -- | -- |
| | 7/31/2013* | 1,000,000 | 6.88% | -- | -- | -- |
| | 8/30/2013* | 1,000,000 | 7.4% | -- | -- | -- |
| | 9/30/2013* | 1,000,000 | 7.98% | -- | -- | -- |
| | 10/31/2013* | 1,000,000 | 8.67% | -- | -- | -- |
| | 11/29/2013* | 1,000,000 | 9.5% | -- | -- | -- |
| | 12/20/2013 | 250,000 | 2.6% | $1.59 | $397,500 | $162,500 |
| | 12/23/2013 | 100,000 | 1.07% | $1.59 | $159,000 | $94,000 |
| | 12/24/2013 | 53,656 | 0.58% | $1.53 | $82,094 | $47,218 |
| | 12/26/2013 | 28,293 | 0.31% | $1.55 | $35,083 | $16,693 |
| | 12/27/2013 | 45,000 | 0.49% | $1.74 | $78,300 | $49,050 |
| | 12/31/2013* | 1,000,000 | 11% | -- | -- | -- |
| | 12/31/2013 | 33,500 | 0.4% | $1.72 | $57,620 | $35,845 |
| | 1/2/2014 | 5,700 | <0.001% | $1.62 | $9,234 | $5,529 |
| | 1/3/2014 | 96,300 | 1.2% | $1.66 | $159,858 | $97,263 |
| | 1/6/2014 | 52,271 | 0.66% | $1.74 | $90,952 | $56,976 |
| | 1/7/2014 | 18,476 | 0.2% | $1.75 | $32,333 | $20,324 |
| | 1/8/2014 | 20,154 | 0.26% | $1.76 | $35,471 | $13,100 |
| | 1/15/2014 | 46,877 | 0.6% | $1.38 | $64,690 | $34,220 |
| | 1/16/2014 | 33,600 | 0.4% | $1.41 | $47,376 | $25,536 |
| | 1/17/2014 | 19,523 | 0.25% | $1.42 | $27,723 | $15,033 |
| | 1/21/2014 | 58,300 | 0.75% | $1.48 | $86,284 | 48,389 |
| | 1/22/2014 | 54,000 | 0.7% | $1.54 | $83,160 | 48,060 |
| | 2/11/2014 | 73,700 | 0.97% | $1.20 | $88,440 | $40,535 |
| | 2/12/2014 | 26,300 | 0.35% | $1.16 | $30,508 | $13,413 |
| | 2/13/2014 | 50,000 | 0.67% | $1.13 | $56,500 | $24,000 |
| | 2/14/2014 | 40,518 | 0.54% | $1.14 | $46,191 | $19,854 |
| | 2/18/2014 | 30,560 | 0.4% | $1.16 | $35,450 | $15,586 |
| | 2/19/2014 | 23,039 | 0.3% | $1.18 | $27,186 | $12,211 |
| | 2/20/2014 | 21,564 | 0.29% | $1.16 | $25,014 | $10,998 |
| | 2/21/2014 | 100,000 | 1.4% | $1.14 | $114,000 | $49,000 |
| | 2/24/2014 | 50,000 | 0.69% | $1.31 | $65,500 | $33,000 |
| | 2/25/2014 | 34,219 | 0.48% | $1.25 | $42,774 | $20,531 |
| | 2/27/2014 | 169,355 | 2.4% | $1.37 | $232,016 | $121,936 |
| | 3/4/2014 | 100,000 | 1.43% | $1.45 | $145,000 | $80,000 |
| | 3/5/2014 | 100,000 | 1.5% | $1.55 | $155,000 | $90,000 |
| | 3/11/2014 | 17,800 | 0.26% | $1.42 | $25,276 | $13,706 |
| | 3/12/2014 | 50,000 | 0.74% | $1.23 | $61,500 | $29,000 |
| | 3/13/2014 | 8,482 | 0.13% | $1.22 | $10,348 | $4,835 |
| | 3/18/2014 | 300,000 | 4.47% | $0.67 | $201,000 | $6,000 |
| | 3/19/2014 | 300,000 | 4.67% | $0.62 | $186,000 | ($9,000) |
| | 3/20/2014 | 300,000 | 4.9% | $0.66 | $198,000 | $3,000 |
| | 3/21/2014 | 182,900 | 3.14% | $0.70 | $128,030 | $9,145 |
| Class | | 10,811,187 | | | $2,607,381 | $1,348,341 |

| | Date Sold | Quantity Sold | Percentage of Ownership | Price Per Share | Proceeds | Profit |
|---|---|---|---|---|---|---|
| Period Totals | | | | | | |

[yellow box] – Class Period transactions (November 8, 2012 through March 17, 2014)

* – Transaction was a "distribution-in-kind" of shares from the Artis Funds to its partners.  Details pertaining to each respective partner's subsequent disposition are not available.

162.     Peterson is the President of Artis Capital Management, Inc. ("ACMI").  ACMI is the general partner of Artis Capital Management, L.P. ("ACM").  ACM serves as an investment advisor for various funds which, at one point in time, held over 30% of KiOR's Class A common stock.   The various funds serviced by ACM include: Artis Partners, L.P., Artis Partners (Institutional), L.P., Artis Partners Ltd., Artis Partners 2X, L.P., Artis Partners 2X (Institutional), L.P., Artis Partners 2X Ltd., Artis Aggressive Growth, L.P., Artis Aggressive Growth Master Fund, L.P., Artis Private Growth Partners, L.P. Artis Private Growth Entrepreneurs Fund, L.P., Artis Private Growth Partners II, L.P., Artis Clean Tech Partners (Institutional), L.P. and Artis Clean Tech Partners Master Fund, L.P. (collectively, the "Artis Funds").   As of May 2012, Peterson owned over 40% of KiOR's Class A common stock.

163.     Peterson, as a significant shareholder, was privy to inside information pertaining to operations at the Columbus Facility and its severe mechanical design problems.  As indicated by the above chart, Peterson engaged in an insider trading strategy that ultimately netted him and his investment funds over $1.3 million in profits.  By doing so, Peterson decreased his overall ownership of KiOR's Class A common stock from 40% to 10% during the course of the Class Period.

164.     The timing of Peterson's sales serves as further indication that he decided to take

advantage of the fact that the general public was unaware of the Columbus Facility's severe design problems.  Beginning in November 2012 and continuing through to just days before Defendants announced the shutdown of the Columbus Facility, Peterson disposed of close to 11 million shares of KiOR stock, which grossly outsize any non-Class Period sales.  Moreover, Peterson's decision to begin selling his stock shortly after February 2013 coincides with the departure of several significant members of the operations staff, including CW1, CW2, CW4, and Greg Neve.  Peterson's trading history supports the conclusion that he, as well as the other significant shareholders and executives, were aware of the Columbus Facility's design problems during the "start-up phase."

165.    Throughout the Class Period, Defendants acted with the intent to defraud, or with a reckless disregard towards the potential of defrauding, Plaintiffs and other members of the class by disseminating false and misleading statements relating to, among other things, (a) the Company's ability to produce commercially meaningful quantities of biofuel at the Columbus Facility at the timetables provided by the Company; (b) the design deficiencies and the fact that they were not "typical" start-up problems; (c) the numerous operational, design, and equipment changes costing tens of millions of dollars just to move toward commercially meaningful production of biofuels; and (d) and the additional mechanical improvements were required after over a year of repairs in order to obtain yields of biofuel that would create a sustainable business.

*Paul O'Connor's Resignation*

166.    O'Connor served on KiOR's Board of Directors from November 2007 through June 2012, and again from March 18, 2014 through August 31, 2014.  Through his company BIOeCON B.V. and its affiliates, O'Connor co-founded KiOR and supplied it in large part with

the technology behind KiOR's biofuel product.   O'Connor also served as KiOR's Chief Technology Officer in 2008 and 2009.

167.    On September 5, 2014, KiOR filed a Form 8-K with the SEC indicating that O'Connor resigned from the Company's Board of Directors as of August 31, 2014.  The Form 8-K further indicated that O'Connor resigned at the unanimous request of the Board of Directors, which was precipitated by outside counsel's review of O'Connor's conduct.   O'Connor's conduct, according to the Form 8-K, included (i) his decision to "with[o]ld a third party technology report, paid for by the Company, from the Board and management"; (ii) "unauthorized communications with persons" during the course of outside counsel's review; and (iii) the "possibility" that O'Connor "failed to comply with the Company's insider trading policy."

168.    KiOR attached O'Connor's resignation letter to the above-mentioned Form 8-K.[21] O'Connor's resignation letter, as described in detail below, confirms the claims, allegations, and theories of liability asserted by Plaintiffs in the Second Amended Complaint.

169.    O'Connor's resignation letter begins by confirming the fact that O'Connor (and his company "BIOeCON") originated "the KiOR technology to convert waste biomass into fuels and chemicals via catalytic pyrolysis (or cracking)."   O'Connor then details how he (as Chief Technology Officer at that point) and Defendant Fred Cannon ("Cannon") worked together in 2008 and 2009 "in building up the organization, proving the concept in a modified [fluid catalytic cracking] pilot plant and leading the research into improved catalysts."   Presciently,

---

[21] O'Connor's resignation letter (and the exhibits attached thereto) is attached hereto as Exhibit "A" and is incorporated herein by reference as if fully set forth below.  KiOR redacted certain portions of O'Connor's resignation letter.  In the version of the letter filed with the SEC, these portions are indicated by "[**]".  Below, these redacted portions are indicated by "[redacted]".

O'Connor writes that "[a]lready then we had some technical disagreements about the road forward and managerial issues about the experience and quality of the people being hired." KiOR declined to renew O'Connor as Chief Technology Officer in October 2009, yet allowed him to remain on the Board of Directors for several years thereafter.

170.    O'Connor grew concerned about KiOR's operations towards the end of 2011.  In response to "additional data" he received, O'Connor was "shocked to see that the yields were lower than reported in February [redacted] and that hardly any progress had been made since the end of 2009."  O'Connor writes that he "immediately informed [Defendant Cannon] . . . about [his] concerns regarding the limited improvements achieved."  O'Connor was permitted to visit KiOR's operations for a "technology review," but only after "several e-mail and phone discussions with [Defendant Cannon]."  Based on his review of KiOR's operations, O'Connor concluded: (i) "that part of the problem of the lower yields, [redacted]"; (ii) yields "ha[d] not improved significantly over the last two years"; and (iii) while it was "possible to reach the target of [redacted] and possibly even also the long term target of [redacted]," doing so would "require a drastically different approach[] than presently being pursued by R&D."

171.    KiOR's Board of Directors (including Defendant Cannon) was aware that the Columbus Facility was incapable of meeting Defendants' stated projections.  O'Connor describes in his letter a Board of Directors meeting in April or May 2012, at which time KiOR's "R&D director" "admitted that [KiOR] should not expect to reach the [redacted] at Columbus, but possibly at the next commercial plant including further reactor modifications."  O'Connor recalls "estimat[ing] that based on the R&D data given to [him] at that time, that the real yields for Columbus would be closer to [redacted]."    Unfortunately none of [O'Connor's]

recommendations [were] followed up."

172.    Defendant Cannon's description of normal "start-up" problems mischaracterized the nature of the design problems impacting production.   In the letter, O'Connor details his concerns during the "start-up" phase of the Columbus Facility which were communicated to Cannon.    O'Connor sent a letter to Defendant Cannon in advance of the 2013 Annual Shareholder Meeting asking "important questions."   During a private meeting with Defendant Cannon at the annual shareholder meeting, Cannon responded to O'Connor's questions by telling O'Connor that he was "too negative" and that "[KiOR] [had] made tremendous progress in the last 18 months in R&D."   Contrary to Cannon, O'Connor's concerns were validated by fact that "several problems were encountered [during the "start-up" phase] leading to production rates of about only [redacted]% of the actual design case.   The first impression was that this was related to 'normal' start-up issues.   After an audit . . . in November 2013 it became clear however that the product yields were in fact much lower than projected [redacted], while the on-stream times were also way too low [redacted]."

173.    The Columbus Facility's design and technology did not allow for commercial scalability.   In or around January 2014, the Board of Directors asked O'Connor to assist KiOR as a "technical expert in reviewing the situation at KiOR."   O'Connor started reviewing the "data from Columbus and R&D" and concluded that "the low yields and on-stream times at Columbus were reasonably in line with the results and experience in the DEMO plant in Houston. ***This mean[t] that the main problems at Columbus [were] already discernable in the DEMO operations and [were] therefore structural and not 'just' operational issues***."   According to O'Connor, the problems at the Columbus Facility can be solved, but "will require a different

85

approach in catalyst selection and operation strategy."  O'Connor notes that in February 2014 he "stressed to the [B]oard that . . . a clear change in technology strategy . . . as well as leadership style . . . is essential to solve the issues."

174.   O'Connor notes that even today, as KiOR attempts to sell itself, the Company continues to circulate "poorly substantiated projections" which "do not include the crucial learnings from the DEMO [in Houston] and Columbus."  In fact, as O'Connor writes, even the projections used to "convince[] the Board" to "build and start-up Columbus" had "not been substantiated in the DEMO [in Houston]."  Instead, the "DEMO predicted reasonably well the poor yields and on-stream times at Columbus."

175.   O'Connor's resignation letter confirms that the Columbus Facility suffered from structural design problems or, for lack of a more specific term, problems substantively more significant than the mere "start-up" problems conveyed by Defendants during the Class Period.  Specifically, O'Connor—a company-insider and scientific expert who communicated directly with Defendants on a repeated basis throughout the Class Period—explains that the Columbus Facility was never suited to produce the yields and/or amounts forecasted.

<u>*SEC Subpoenas*</u>

176.   KiOR disclosed in its most recent quarterly disclosure (Form 10-Q) that the SEC's formal investigation remains ongoing.  In addition to the SEC's January 28, 2014 subpoena, KiOR received a second subpoena dated July 17, 2014, also "pursuant to a formal order of investigation."  KiOR indicated that the subpoena "seek[s] documents about, among other subject matters, the progress at its Columbus Facility, its projected biofuel production levels and the status of the Company's technology."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

177.   Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired KiOR securities during the Class Period, and were damaged by the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

178.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, KiOR securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by KiOR or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  As of November 6, 2012, several days before the start of the Class Period, KiOR had 51,487,890 outstanding shares of common stock.  Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world.  Joinder would be highly impracticable.

179.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

180.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

181.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of KiOR;

- whether the Individual Defendants caused KiOR to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of KiOR securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

-  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

182.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**RELIANCE PRESUMPTION: FRAUD-ON-THE-MARKET DOCTRINE**

183.    At all relevant times, the market for KiOR's common stock was an efficient market for the following reasons, among others:

(a)    KiOR's  common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    During the Class Period, on average, 1.9 million shares of KiOR's common stock were traded on a weekly basis.  Approximately 4.25% of KiOR's outstanding shares were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

(c)    KiOR regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    KiOR was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

(e)    Numerous firms were active market-makers in KiOR stock at all times during the Class Period;  and

(f)    Unexpected material news about KiOR was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

90.    As a result of the foregoing, the market for KiOR's common stock promptly digested current information regarding Kiro from all publicly available sources and reflected such information in KiOR's stock price.  Under these circumstances, all purchasers of KiOR's

common stock during the Class Period suffered similar injury through their purchase of KiOR's common stock at artificially inflated prices, and a presumption of reliance applies.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE*

184.    Neither Plaintiffs nor the Class need prove reliance - either individually or as a class because under the circumstances of this case, which involves a failure to disclose and disclosure and internal control deficiencies, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.  Here, the facts withheld were material because a reasonable investor would have considered the Columbus Facility's production capabilities critical in evaluating the investment potential of the Company.

## THE SAFE HARBOR AND BESPEAKS CAUTION DOCTRINES DO NOT APPLY

185.    KiOR's "Safe Harbor" warnings accompanying its forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the material misstatements and omissions pleaded herein.  Many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected."  Nor were there any meaningful cautionary statements identifying the important factors that had already occurred or the known risks to make such warnings sufficient.

186.    Defendants are also liable for any false or misleading FLS pleaded because, at the

time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of CenturyLink who knew that the FLS was false.  Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

### FIRST CLAIM
**Violation of Section 10(b) of
The Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

187.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

188.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

189.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and

other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of KiOR securities; and (iii) cause Plaintiffs and other members of the Class to purchase KiOR securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

190.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for KiOR securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about KiOR's finances and business prospects.

191.    By virtue of their positions at KiOR, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

192.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers

and/or directors of KiOR, the Individual Defendants had knowledge of the details of KiOR's internal affairs.

193.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of KiOR. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to KiOR's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of KiOR securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning KiOR's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased KiOR securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

194.    During the Class Period, KiOR securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of KiOR securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of KiOR securities was substantially lower than the prices

paid by Plaintiffs and the other members of the Class. The market price of KiOR securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

195. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

196. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

### SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

197. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

198. During the Class Period, the Individual Defendants participated in the operation and management of KiOR, and conducted and participated, directly and indirectly, in the conduct of KiOR's business affairs. Because of their senior positions, they knew the adverse non-public information about KiOR's ability to produce its biofuels in commercially viable quantities at the Columbus Facility.

199. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to KiOR's financial condition and results of operations, and to correct promptly any public statements

issued by KiOR which had become materially false or misleading.

200.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which KiOR disseminated in the marketplace during the Class Period concerning KiOR's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause KiOR to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of KiOR within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of KiOR securities.

201.    Each of the Individual Defendants, therefore, acted as a controlling person of KiOR. By reason of their senior management positions and/or being directors of KiOR, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, KiOR to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of KiOR and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

202.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by KiOR.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

(b)   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:                                      **GASCOYNE & BULLION, P.C.**

By: _____
James Gascoyne (Fed. No. 1980 / Tx. No. 07744800)
77 Sugar Creek Center Blvd.
Sugar Land, Texas 77478
Phone: (281) 340-7000
Fax: (281) 340-7001

***Liaison Counsel***

[*co-lead counsel on following page*]

96

**LEVI & KORSINSKY LLP**

By: _____
Nicholas I. Porritt, Esq. (*admitted pro hac vice*)
Adam M. Apton, Esq. (*admitted pro hac vice*)
1101 30th Street NW, Suite 115
Washington, D.C. 20007
Phone: (202) 524-4290
Fax: (202) 333-2121

**THE ROSEN LAW FIRM, P.A.**

By: _____
Laurence M. Rosen, Esq. (*admitted pro hac vice*)
Phillip Kim, Esq. (*admitted pro hac vice*)
275 Madison Avenue, 34th Floor
New York, New York 10016
Phone: (212) 686-1060
Fax: (212) 202-3827

***Co-Lead Counsel***